# Exhibit B

_____

**LOAN AGREEMENT**


Dated as of April 24, 2017

Between


ACROPOLIS GARDENS REALTY CORP.,
as Borrower


and


NATIXIS REAL ESTATE CAPITAL LLC,
as Lender


_____

# TABLE OF CONTENTS

Page

1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................................... 1
   1.1 Terms and Definitions .......................................................................................... 1
       1.1.1 Key Terms and Definitions ....................................................................... 1
       1.1.2 Additional Terms and Definitions ............................................................. 1
   1.2 Index of Other Definitions ................................................................................. 10
   1.3 Principles of Construction ................................................................................. 10

2. GENERAL LOAN TERMS ................................................................................... 10
   2.1 The Loan ............................................................................................................ 10
   2.2 Interest; Monthly Payments ............................................................................ 10
       2.2.1 Generally ................................................................................................... 10
       2.2.2 Default Rate .............................................................................................. 11
       2.2.3 Taxes ......................................................................................................... 11
       2.2.4 Requirements of Law ............................................................................... 11
   2.3 Loan Repayment and Defeasance ................................................................... 13
       2.3.1 Repayment ................................................................................................ 13
       2.3.2 Mandatory Prepayments ........................................................................... 13
       2.3.3 Voluntary Defeasance of the Note ........................................................... 13
       2.3.4 Permitted Prepayment .............................................................................. 16
   2.4 Release of Property ........................................................................................... 16
       2.4.1 Release on Defeasance ............................................................................. 16
       2.4.2 Release on Payment in Full ...................................................................... 16
   2.5 Payments and Computations ............................................................................ 16
       2.5.1 Making of Payments ................................................................................. 16
       2.5.2 Computations ............................................................................................ 17
       2.5.3 Late Payment Charge ................................................................................ 17

3. RESERVES ........................................................................................................... 17
   3.1 Intentionally Omitted ........................................................................................ 17
   3.2 Required Repairs ............................................................................................... 17
       3.2.1 Completion of Required Repairs .............................................................. 17
       3.2.2 Required Repairs Reserves ....................................................................... 17
   3.3 Taxes and Insurance .......................................................................................... 18
   3.4 Capital Expense Reserves ................................................................................. 18
   3.5 Intentionally Omitted ........................................................................................ 19
   3.6 Intentionally Omitted ........................................................................................ 19
   3.7 Casualty/Condemnation Subaccount ............................................................... 19
   3.8 Intentionally Omitted ........................................................................................ 19
   3.9 Grant of Security Interest; Application of Funds ............................................. 19
   3.10 Intentionally Omitted ........................................................................................ 20
   3.11 Intentionally Omitted ........................................................................................ 20
   3.12 Common Charge Reserve Funds ...................................................................... 20

4. REPRESENTATIONS AND WARRANTIES ....................................................... 20
   4.1 Organization; Special Purpose ......................................................................... 20

i

| | | | |
|---|---|---|---|
| | 4.2 | Proceedings; Enforceability | 21 |
| | 4.3 | No Conflicts | 21 |
| | 4.4 | Litigation | 21 |
| | 4.5 | Agreements | 21 |
| | 4.6 | Title | 21 |
| | 4.7 | No Bankruptcy Filing | 22 |
| | 4.8 | Full and Accurate Disclosure | 22 |
| | 4.9 | No Plan Assets | 23 |
| | 4.10 | Compliance | 23 |
| | 4.11 | Contracts | 23 |
| | 4.12 | Federal Reserve Regulations; Investment Company Act | 23 |
| | 4.13 | Utilities and Public Access | 24 |
| | 4.14 | Physical Condition | 24 |
| | 4.15 | Leases | 24 |
| | 4.16 | Fraudulent Transfer | 24 |
| | 4.17 | Ownership of Borrower | 25 |
| | 4.18 | Management Agreement | 25 |
| | 4.19 | Hazardous Substances | 25 |
| | 4.20 | Principal Place of Business | 26 |
| | 4.21 | Other Debt | 26 |
| | 4.22 | Embargoed Person | 26 |
| | 4.23 | Anti–Money Laundering | 26 |
| | 4.24 | Condominium Documents | 26 |
| | 4.25 | Offering Plan | 27 |
| 5. | COVENANTS | | 27 |
| | 5.1 | Existence | 27 |
| | 5.2 | Taxes | 27 |
| | 5.3 | Repairs; Maintenance and Compliance; Alterations | 28 |
| | | 5.3.1 Repairs; Maintenance and Compliance | 28 |
| | | 5.3.2 Alterations | 28 |
| | 5.4 | Performance of Other Agreements | 29 |
| | 5.5 | Cooperate in Legal Proceedings | 29 |
| | 5.6 | Further Assurances | 29 |
| | 5.7 | Environmental Matters | 29 |
| | | 5.7.1 Hazardous Substances | 29 |
| | | 5.7.2 Environmental Monitoring | 30 |
| | 5.8 | Title to the Property; Liens | 31 |
| | 5.9 | Leases | 31 |
| | | 5.9.1 Generally | 31 |
| | | 5.9.2 Material Leases | 31 |
| | | 5.9.3 Intentionally Omitted | 32 |
| | | 5.9.4 Additional Covenants with respect to Leases | 32 |
| | 5.10 | Estoppel Statement | 33 |
| | 5.11 | Property Management | 33 |
| | | 5.11.1 Management Agreement | 33 |
| | | 5.11.2 Termination of Manager | 34 |

5.12   Special Purpose Entity ............................................................................ 34
5.13   Assumption in Non–Consolidation Opinion ........................................... 34
5.14   Change In Business or Operation of Property ........................................ 34
5.15   Certain Prohibited Actions ..................................................................... 34
5.16   Prohibited Transfers .............................................................................. 35
5.17   Expenses ................................................................................................. 37
5.18   Indemnity ............................................................................................... 37
5.19   Embargoed Person ................................................................................. 38
5.20   Anti–Money Laundering ........................................................................ 39
5.21   ERISA .................................................................................................... 39
5.22   Condominium Units ............................................................................... 40
5.23   Violations ............................................................................................... 40
5.24   Lead Based Paint Program ..................................................................... 40
5.25   ACM Maintenance Program ................................................................... 40
5.26   Offering Plan ......................................................................................... 41

6.     NOTICES AND REPORTING .............................................................. 41
6.1    Notices .................................................................................................... 41
6.2    Borrower Notices and Deliveries ........................................................... 41
6.3    Financial Reporting ................................................................................ 42
       6.3.1   Bookkeeping ............................................................. 42
       6.3.2   Annual Reports ......................................................... 42
       6.3.3   Monthly/Quarterly Reports ...................................... 43
       6.3.4   Other Reports ............................................................ 43
       6.3.5   Annual Budget .......................................................... 43
       6.3.6   Breach ....................................................................... 43

7.     INSURANCE; CASUALTY; AND CONDEMNATION ........................... 44
7.1    Insurance ................................................................................................ 44
       7.1.1   Coverage ................................................................... 44
       7.1.2   Policies ...................................................................... 46
7.2    Casualty .................................................................................................. 47
       7.2.1   Notice; Restoration ................................................... 47
       7.2.2   Settlement of Proceeds .............................................. 48
7.3    Condemnation ........................................................................................ 48
       7.3.1   Notice; Restoration ................................................... 48
       7.3.2   Collection of Award .................................................. 48
7.4    Application of Proceeds or Award ........................................................... 49
       7.4.1   Application to Restoration ......................................... 49
       7.4.2   Application to Debt ................................................... 49
       7.4.3   Procedure for Application to Restoration .................. 50
       7.4.4   Prepayment upon Partial Condemnation ................... 50

8.     DEFAULTS ............................................................................................ 51
8.1    Events of Default .................................................................................... 51
8.2    Remedies ................................................................................................ 52
       8.2.1   Acceleration .............................................................. 52
       8.2.2   Remedies Cumulative ............................................... 53

iii

|  | 8.2.3 | Severance | 53 |
|  | 8.2.4 | Delay | 53 |
|  | 8.2.5 | Lender's Right to Perform | 54 |
| 9. | | SECONDARY MARKET PROVISIONS | 54 |
|  | 9.1 | Transfer of Loan | 54 |
|  | 9.2 | Use of Information | 55 |
|  | 9.3 | Borrower Indemnity | 56 |
|  | 9.4 | Restructuring of Loan | 58 |
| 10. | | MISCELLANEOUS | 59 |
|  | 10.1 | Exculpation | 59 |
|  | 10.2 | Brokers and Financial Advisors | 61 |
|  | 10.3 | Retention of Servicer | 61 |
|  | 10.4 | Survival | 62 |
|  | 10.5 | Lender's Discretion | 62 |
|  | 10.6 | Governing Law | 62 |
|  | 10.7 | Modification, Waiver in Writing | 63 |
|  | 10.8 | Trial by Jury | 64 |
|  | 10.9 | Headings/Exhibits | 64 |
|  | 10.10 | Severability | 64 |
|  | 10.11 | Preferences | 64 |
|  | 10.12 | Waiver of Notice | 64 |
|  | 10.13 | Remedies of Borrower | 64 |
|  | 10.14 | Prior Agreements | 65 |
|  | 10.15 | Offsets, Counterclaims and Defenses | 65 |
|  | 10.16 | Publicity | 65 |
|  | 10.17 | No Usury | 65 |
|  | 10.18 | Conflict; Construction of Documents | 66 |
|  | 10.19 | No Third Party Beneficiaries | 66 |
|  | 10.20 | Yield Maintenance Premium | 66 |
|  | 10.21 | Assignment | 67 |
|  | 10.22 | Counterparts | 67 |
| 11. | | CONDOMINIUM PROVISIONS | 67 |
|  | 11.1 | Condominium Provisions | 67 |
|  | | 11.1.1   Borrower shall: | 67 |
|  | 11.2 | Noncompliance | 69 |
|  | 11.3 | Event of Default | 69 |
|  | 11.4 | Failure to Pay Amounts Due | 70 |

AmericasActive:8841688.17

Schedule 1  –  Index of Other Definitions
Schedule 2  –  Required Repairs
Schedule 3  –  Organization of Borrower
Schedule 4  –  Definition of Special Purpose Entity
Schedule 5  -   Violations

AmericasActive:8841688.17

## LOAN AGREEMENT

This LOAN AGREEMENT (as the same may be modified, supplemented, amended or otherwise changed, this "***Agreement***"), is made as of April 24, 2017, by and between ACROPOLIS GARDENS REALTY CORP., a New York corporation (together with its permitted successors and assigns, "***Borrower***") and NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company, (together with its successors and assigns, "***Lender***").

1.   **DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

    1.1   **Terms and Definitions.**   The following terms have the meanings set forth below:

        1.1.1   **Key Terms and Definitions**.

        ***Interest Rate***:  a rate of interest equal to 3.72% per annum.

        ***Manager***:   METROPOLITAN PACIFIC PROPERTIES, INC., a Delaware corporation, or any successor, assignee or replacement manager appointed by Borrower in accordance with Section 5.11 hereof.

        ***Monthly Debt Service Payment Amount***:  shall mean an amount equal to the Interest only payable for the applicable Interest Period for each Payment Date.

        ***Principal***:  maximum original principal amount of $45,000,000.00.

        ***Property***:   the parcel of real property and Improvements thereon and the condominium units, owned by Borrower and encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and condominium units and all other collateral for the Loan as more particularly described in the Granting Clauses of the Security Instrument.  The Property is located in Queens, New York.

        ***Start–up Date***:  the earlier of: (a) the fourth anniversary of the date hereof; and (b) the date that is the two (2) years from the "start–up day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust holding the Note, or if more than one Note exists evidencing the Debt the REMIC Trust holding the final portion of the Note to be securitized.

        ***Stated Maturity Date***:  May 5, 2027.

        1.1.2   **Additional Terms and Definitions**.

        ***Affiliate***:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

        ***Approved Capital Expenses***:  Capital Expenses incurred by Borrower, provided that such Capital Expenses shall either be (i) included in the approved Capital Budget for the current calendar month or (ii) approved by Lender.

***Bail-In Action***:  means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

***Bail-In Legislation***:  means, (a) with respect to any EEA Member Country implementing Article 55 of the Bank Recovery and Resolution Directive, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) the then applicable Commission Delegated Regulation (if any) supplementing the Bank Recovery and Resolution Directive in relation to Article 55 thereof.

***Bank Recovery and Resolution Directive***:  means Directive 2014/59/EU of the European Parliament and of the Council of the European Union.

***Business Day***:  any day other than a Saturday or a Sunday or  any day on which commercial banks in New York, New York are authorized or required to close.

***Capital Expenses***:  expenses that are capital in nature or required under GAAP to be capitalized.

***Code***:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

***Common Charges:*** shall mean any common charges, association fees or dues or other recurring expenses, or any regular or special assessments, or any other fees or charges due and payable by Borrower under the Condominium Declaration or any other Condominium Documents.

***Condominium:*** shall mean the Condominium regime established by the Condominium Declaration.

***Condominium Act:*** shall mean Article 9-B of the Real Property Law of the State of New York, and all modifications, supplements and replacements thereof, and regulations with respect thereto, now or hereafter enacted or promulgated.

***Condominium Association:*** shall mean the condominium association established pursuant to the Condominium Documents.

***Condominium Declaration:*** shall mean that certain Declaration of the Acropolis Gardens Condominium, recorded in the Office of the Register of The City of New York, Queens County, on July 22, 1988 in Reel 2643, Page 2344, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

***Condominium Documents:*** shall mean all documents necessary for the creation of the Condominium and the operation of the Property as a condominium unit, and all other reports, disclosure statements and documents relating to the Condominium, including any documents necessary to establish and operate a separate condominium association to regulate and administer the Condominium, and all exhibits, amendments or supplements thereto from

2

time to time, and otherwise used in connection with the creation of the Condominium and the operation of the Condominium.

*Condominium Units:* shall mean the units of the Condominium.

*Control*:  with respect to any Person, either (i) ownership, directly or indirectly, of forty–nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

*Debt*:  the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

*Debt Service*:  with respect to any particular period, the scheduled Principal and interest payments due under the Note in such period.

*Debt Service Coverage Ratio*:  as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period.

*Default*:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

*Default Rate*:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

*Defeasance Percentage*:  the percentage derived by dividing, (i) in the case of an initial Partial Defeasance, the original principal amount of the Defeased Note by the original principal amount of the Note or (ii) in the case of a subsequent Defeasance, the amount of the subsequent Defeased Note by the original principal amount of its corresponding Undefeased Note.

*EEA Financial Institution*:  means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

*EEA Member Country*:  means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

*EEA Resolution Authority*:  means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

3

*ERISA*:  the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*:  all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common Control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

*Escrows*:  amounts paid by Borrower into Subaccounts established for the purpose of paying Taxes, the premiums for Policies, ground rents, franchise and license fees.

*EU Bail-In Legislation Schedule*:  means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

*Fiscal Year*: shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

*GAAP*:  generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*Governmental Authority*:  any court, board, agency, commission, office or authority of any nature whatsoever for any United States and/or U.S. State governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

*Interest Period*:  (i) the period from the date hereof through the next day of a calendar month that is the fourth (4th) day of such calendar month, and (ii) each period thereafter from the fifth (5th) day of each calendar month through the fourth (4th) day of the next calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, in the event Lender shall have elected to change the date on which scheduled payments under the Loan are due, as described in the definition of "Payment Date", from and after the effective date of such election, each Interest Period shall commence on the day of each month in which occurs such changed Payment Date and end on the day immediately preceding the following Payment Date, as so changed.

*Leases*:  all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

*Legal Requirements*:  statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in

4

force affecting all or part of the Property.

**Lien**:  any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

**Loan Documents**:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof:  (i) Amended, Restated and Consolidated Promissory Note made by Borrower to Lender in the principal amount equal to the Loan (as the same may be amended, modified, restated, severed, split, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*"), (ii) the Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower in favor of Lender which covers the Property (the "*Security Instrument*"), (iii) the Assignment of Leases and Rents from Borrower to Lender, and (iv) the Assignment of Agreements, Licenses, Permits and Contracts from Borrower to Lender; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented or otherwise modified from time to time.

**Loan–to–Value** (**LTV**):  a fraction expressed as a percentage, the numerator of which is the principal balance of the Note, and the denominator of which is the appraised value of the Property as determined by Lender based upon a current "as–is" MAI appraisal for the Property obtained by and acceptable to Lender at Borrower's sole cost and expense.

**Management Agreement**:  the management agreement between Borrower and Manager, pursuant to which Manager is to manage the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 5.11.

**Material Alteration**:  any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property, or (ii) non-structural alteration the cost of which exceeds $250,000; provided, however, that in no event shall any of the following constitute a Material Alteration (a) any Required Repairs, (b) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, or (c) alterations performed as part of a Restoration.

**Material Lease**:  shall mean any Lease.

**Maturity Date**:  the date on which the final payment of principal of the Note (or the Defeased Note, if applicable) becomes due and payable as therein provided, whether at the

5

Stated Maturity Date, by declaration of acceleration, or otherwise.

*Natixis*:  means Natixis Real Estate Capital LLC, a Delaware limited liability company, its successors and assigns.

*Net Operating Income*:  for any period, the actual net operating income of the Property after deducting therefrom deposits to (but not withdrawals from) any reserves required under this Agreement.

*NRSRO*: shall mean any credit rating agency that has elected to be treated as a nationally-recognized statistical rating agency for purposes of the Exchange Act irrespective of whether or not such credit rating agency has been engaged by Lender or another Indemnified Party to rate any of the Securities issued in connection with a Secondary Market Transaction involving the Loan or any portion thereof.

*Officer's Certificate*:  a certificate delivered to Lender by Borrower which is signed by a senior executive officer (i.e., President, Vice-President, etc.) of Borrower.

*Offering Plan:* shall mean the Cooperative offering Plan for the Residential Condominium Unit of the Acropolis Gardens Condominium, date as of January 26, 1988, as amended by Amendments Nos. 1 through 16.

*Open Prepayment Date*:  the Payment Date which is closest to the 60th day prior to the Stated Maturity Date for the Loan.

*Other Charges:* shall mean all ground rents, condominium or owner's association charges, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

*Payment Date*:  the fifth $(5^{th})$ day of each calendar month or, if such day is not a Business Day, the immediately preceding Business Day; provided, however, that Lender may elect once during the Term, in its sole discretion, to change the date on which scheduled payments are due under the Loan upon thirty (30) days written notice thereof to Borrower setting forth such changed date, in which event, upon the effective date of such notice, the Payment Date shall be the date set forth therein.

*Permitted Encumbrances*: (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the title insurance policy insuring the Lien of the Security Instrument, (iii) Liens, if any, for Taxes or other charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien and (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion.

*Permitted Indebtedness*:  (i) the Debt (ii) the Subordinate Loan, and (iii) and unsecured trade payables incurred in the ordinary course of business relating to the ownership

6

and operation of the Property which do not exceed, at any time, a maximum amount of three percent (3%) of the original amount of the Principal and are paid within sixty (60) days of the date incurred.  No indebtedness other than the Debt and the Subordinate Loan may be secured (subordinate or pari passu) by the Property.

*Permitted Transfers*:  (i) a Lease entered into in accordance with the Loan Documents, (ii) a Special Transfer in accordance with the requirements set forth in Section 5.16, (iii) a Permitted Encumbrance, or (iv) provided that no Default or Event of Default shall then exist, a Transfer of an interest in Borrower, provided that (A) such Transfer shall not cause the transferee (together with its Affiliates) to acquire Control of Borrower, (B) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than ten (10) days prior to the date of such Transfer, and (C) the legal and financial structure of Borrower and its members and the single purpose nature and bankruptcy remoteness of Borrower and its members after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements.

*Person*:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

*Plan*:  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

*"Proprietary Lease"* shall mean a residential occupancy lease, by and between Borrower, as landlord, and an individual shareholder (which ownership is evidenced by a stock certificate), as tenant, for an individual residential apartment unit associated with the shares held by the individual shareholder.

*"Proprietary Lease Transfer"* shall mean in connection with the sale of shares in the Borrower the (i) termination of the Proprietary Lease issued to the shareholder selling such shares, and (ii) the entering into of a new Proprietary Lease between Borrower, as landlord, and the purchaser of the shares as the new Tenant in accordance with Article V of the By-Laws of the Borrower.

*Rating Agency*:  each of Standard & Poor's Ratings Services, a division of The McGraw–Hill Companies, Inc. ("*S&P*"), Moody's Investors Service, Inc. ("*Moody's*"), and Fitch, Inc. or any other nationally–recognized statistical rating organization to the extent any of the foregoing have been engaged by Lender or its designee in connection with or in anticipation of any Secondary Market Transaction.

*Rating Comfort Letter*:  a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction.

7

**Regulation AB**: shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

**REMIC Trust**:  a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note, or any portion thereof.

**Rents**:   all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

**Servicer**:  a servicer selected by Lender to service the Loan.

**State**:  the state in which the Property is located.

**Subordinate Loan:**  shall mean that certain wraparound mortgage loan, made by Acropolis Associates, a New York partnership (the "**Subordinate Lender**"), to Borrower, in an amount not to exceed $45,000,001.00, which Partner Loan shall (a) have an interest rate not exceed the Interest Rate, (b) not result in a Debt Service Coverage Ratio (when factoring the outstanding principal amount of the Subordinate Loan) of less than 2.60:1.00, (c) a loan to value ratio (when factoring the outstanding principal amount of the Subordinate Loan) of more than 50.8%, and (d) whose maturity date shall not extend past the Maturity Date hereunder; provided, however, that any Partner Loan (i) shall be subordinate to the Debt in all respects and Borrower and Partner shall have delivered to Lender a subordination and standstill agreement in form and substance satisfactory to Lender with respect to same, (ii) shall be repayable only out of excess cash flow after payment of all expenses related to the Property, including, without limitation, debt service on the Debt and escrows provided for under the Loan Documents and all other sums payable under the Loan Documents, and (iii) shall not be assignable.

**Taxes**:  all real estate and personal property, taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.

**Tenant**:  any existing tenant, replacement tenant or proposed tenant under any existing Lease or any proposed Lease.

**Term**:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

**Toxic Mold**:  any toxic mold or fungus at the Property which is of a type (i) that might pose a significant risk to human health or the environment or (ii) that would negatively impact the value of the Property.

**Transfer**:  any sale, conveyance, transfer, lease or assignment, Lien, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, including forfeiture, of, on, in or affecting (i) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (ii) any direct or indirect interest in Borrower (including any profit interest), or (iii) the direct or indirect right or power to direct or cause the direction of the management and policies of Borrower, through the ownership of voting securities, by contract or otherwise.

**UCC**:  the Uniform Commercial Code as in effect in the State.

**U.S. Obligations**:  direct non–callable obligations backed by the full faith and credit of the United States of America.

**Welfare Plan**:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

**Write-Down and Conversion Powers:**  means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**Yield Maintenance Premium**:  means a prepayment fee equal to the greater of (i) three percent (3%) of the amount of Principal being prepaid and (ii) the product obtained by multiplying:

(A)      the amount of Principal being prepaid,

*by*

(B)      the excess (if any) of the Monthly Note Rate over the Assumed Reinvestment Rate,

*by*

(C)      the Present Value Factor.

The following definitions shall apply:

**Monthly Note Rate:** one–twelfth (1/12) of the Interest Rate, expressed as a decimal calculated to five digits.

**Assumed Reinvestment Rate:** one–twelfth (1/12) of the yield rate equal to the lesser of (i) the yield on the U.S. Treasury issue (primary issue) with a maturity date closest to the Open Prepayment Date, or (ii) the yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the Debt (assuming prepayment in full on the Open Prepayment Date), with each such yield being based on the bid price for such issue as published in the Wall Street Journal on the date that is fourteen (14) days prior to the date of such prepayment (or, if such bid price is not published on that

9

date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield.

**Present Value Factor:** the factor that discounts to present value the costs resulting to Lender from the difference in interest rates during the months remaining between the date of prepayment and the Open Prepayment Date, using the Assumed Reinvestment Rate as the discount rate, with monthly compounding, expressed numerically as follows:

$$\frac{1 - \left(\dfrac{1}{1 + ARR}\right)^{n}}{ARR}$$

**n** = number of months remaining between the date of prepayment and the Open Prepayment Date

**ARR** = Assumed Reinvestment Rate

**1.2**   **Index of Other Definitions.**   An index of other terms which are defined in this Agreement or in other Loan Documents is set forth on **Schedule 1**.

**1.3**   **Principles of Construction.**   Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## 2.   GENERAL LOAN TERMS

**2.1**   **The Loan.**   Lender is making a loan (the "*Loan*") to Borrower on the date hereof, in the original principal amount (the "*Principal*") of $45,000,000.00, which shall mature on the Stated Maturity Date. Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) acquire or refinance the Property, (ii) fund certain of the Subaccounts, and (iii) pay transaction costs. Any excess proceeds may be used for any lawful purpose. No amount repaid in respect of the Loan may be reborrowed.

**2.2**   **Interest; Monthly Payments**.

**2.2.1**   **Generally.**   From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided. On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including May 4, 2017. On June 5, 2017 (the "*First Payment Date*") and each Payment Date thereafter through and including the Payment Date immediately preceding the Stated Maturity Date, Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount. The

Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued from the scheduled Payment Date preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid through the day of the month immediately preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid, notwithstanding that the actual Payment Date may not have been the scheduled Payment Date because the scheduled Payment Date is not a Business Day.  The remainder of such Monthly Debt Service Payment Amount shall be applied to the reduction of the unpaid Principal. All accrued and unpaid interest shall be due and payable on the Maturity Date.  If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.

        **2.2.2   Default Rate.**   After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

        **2.2.3   Taxes.**   Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by law or regulation of any Governmental Authority (all such non–excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "*Applicable Taxes*").  If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply:  (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law (provided, Borrower shall be permitted to remit such payments to Lender and then shall, absent the continaunce of an Event of Default make such patyments to the relevant taxation authority). Payments pursuant to this Section 2.2.3 shall be made within ten (10) days after the date Lender makes written demand therefor.

        **2.2.4   Requirements of Law**.

        (a)   If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

        (i)   shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (excluding net income taxes or franchise taxes) or change the basis of taxation of payments to Lender in respect thereof;

        (ii)   shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or

other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender;

        (iii)      shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender reasonably deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than ten (10) Business Days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.

        (b)      If Lender shall have determined that the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount reasonably deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall promptly, upon notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).

        (c)      If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary.

        (d)      Notwithstanding anything to the contrary in this Agreement or in any of the other Loan Documents, Borrower acknowledges that any liability of any EEA Financial Institution, including without limitation Lender or any of its successors or assigns, arising under this Agreement or under any of the other Loan Documents, except to the extent such liability is excluded under the Bail-In Legislation from the scope of any Bail-In Action, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

        (i)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising under this Agreement or under any of the other Loan Documents which may be payable to it by any party hereto that is an EEA Financial Institution; and

        (ii)      the effects of any Bail-in Action on any such liability, including, if

12

applicable, (X) a reduction in full or in part or cancellation of any such liability including without limitation a reduction in any accrued or unpaid interest in respect of such liability, (Y) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or under any of the other Loan Documents, or (Z) the variation of the terms of this Agreement or under any of the other Loan Documents to give effect to the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**2.3** **Loan Repayment and Defeasance**.

**2.3.1** **Repayment.** Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. Borrower shall have no right to prepay or defease all or any portion of the Principal, except in accordance with Sections 2.3.2, 2.3.3 and 2.3.4 below. Except during the continuance of an Event of Default, all proceeds of any repayment, including permitted prepayments, of the Loan shall be applied by Lender as follows in the following order of priority: *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Stated Maturity Date). Notwithstanding the foregoing, if (i) no Event of Default then exists, the Yield Maintenance Premium shall not be due in connection with a prepayment of the Loan on or after the Open Prepayment Date and (ii) there exists an Event of Default, then, irrespective of when prepayment is made, Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium. During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed–in–lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

**2.3.2** **Mandatory Prepayments.** The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "***Casualty/Condemnation Prepayment***"), in the manner and to the extent set forth in Section 7.4.2. Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1, and if such Casualty/Condemnation Payment is made on any date other than a Payment Date, then such Casualty/Condemnation Payment shall include interest that would have accrued on the Principal prepaid to but not including the next Payment Date. Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium.

**2.3.3** **Voluntary Defeasance of the Note**.

13

(a)     Subject to the terms and conditions set forth in this <u>Section 2.3.3</u>, Borrower may defease the entire amount of the Principal (a "***Full Defeasance***") or a portion of the Principal (a "***Partial Defeasance***") (any such Full Defeasance or Partial Defeasance, a "***Defeasance***"); provided, that no Defeasance may occur (i) prior to the Start–up Date, (ii) if an Event of Default shall have occurred (unless such Event of Default will be cured by the Defeasance) and (iii) on any date other than a Payment Date.  Each Defeasance shall be subject, in each case, to the satisfaction of all of the following conditions precedent:

(i)     Borrower will give Lender not less than thirty (30) days prior written notice (the "***Defeasance Notice***") specifying a Payment Date (the "***Defeasance Date***") on which a Defeasance Deposit (hereinafter defined) is to be made.

(ii)     Payment to Lender of all accrued and unpaid interest on the unpaid Principal of the Note to and including the Defeasance Date and the scheduled amortization payment due on such Defeasance Date.

(iii)     Payment to Lender of all other sums, not including scheduled interest or Principal payments, then due and payable under the Note and the other Loan Documents.

(iv)     Payment to Lender of an amount equal to the sum of (x) an amount sufficient to purchase U.S. Obligations which provide payments that will meet the Scheduled Defeasance Payments, (y) costs and expenses incurred or to be incurred in the purchase of the U.S. Obligations and (z) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the Defeasance (the "***Defeasance Deposit***").

(v)     Payment to Lender of all costs and expenses incurred by Lender in connection with such Defeasance, including reasonable attorneys' fees.

(vi)     In the case of a Partial Defeasance, the execution and delivery by Borrower of all necessary documents to amend and restate the Note and issue two substitute notes, one having a principal balance equal to the defeased portion of the original Note (the "***Defeased Note***") and the other having a principal balance equal to the undefeased portion of the original Note (the "***Undefeased Note***").  The Defeased Note and Undefeased Note shall have terms identical to the terms of the Note, except for the principal balance and a pro rata allocation of the Monthly Debt Service Payment Amount. (After a Partial Defeasance, all references hereunder and in the other Loan Documents to the term "Note" shall mean and be deemed to refer to the Undefeased Note, unless expressly provided to the contrary.)   A Defeased Note cannot be the subject of any further Defeasance.

(vii)     Delivery to Lender of: (A) a security agreement, in form and substance satisfactory to Lender, creating a first priority lien on the Defeasance Deposit and the U.S. Obligations (hereinafter defined) purchased on behalf of Borrower with the Defeasance Deposit in accordance with this provision of this <u>Section 2.3.3</u> (the "***Security Agreement***"); (B) an Officer's Certificate of Borrower certifying that the requirements

14

set forth in Section 2.3.3(a) have been satisfied; (C) an opinion of counsel for Borrower in form and substance satisfactory to Lender stating, among other things, that Lender has a perfected first priority security interest in the Defeasance Deposit and the U.S. Obligations purchased by Lender on behalf of Borrower, that the Security Agreement is the legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms and that the Defeasance will not adversely affect the status of any REMIC Trust formed in connection with a Secondary Market Transaction; (D) a certificate of an accounting firm acceptable to Lender which certifies that the U.S. Obligations are sufficient to make the Scheduled Defeasance Payments; (E) a Rating Comfort Letter from each applicable Rating Agency with respect to such Defeasance; and (F) such other certificates, documents or instruments as Lender may reasonably request.

In connection with the conditions set forth in this Section 2.3.3(a), Borrower hereby appoints Lender as its agent and attorney–in–fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations which provide payments (A) on or prior to, but as close as possible to, all successive Payment Dates after the date of calculation through the Stated Maturity Date (and in connection therewith Borrower shall not be permitted to provide early notice of prepayment pursuant to Section 2.3.4 hereof; provided, however, Successor Borrower (as defined below) shall be permitted to provide such notice of prepayment) and (B) in amounts sufficient to pay, (x) in the case of a Full Defeasance, the Monthly Debt Service Payment Amount required under the Note (or Undefeased Note, as the case may be) together with the unpaid Principal of the Note (or Undefeased Note, as the case may be) payable on the Stated Maturity Date and (y) in the case of a Partial Defeasance, the Monthly Debt Service Payment Amount multiplied by the Defeasance Percentage together with the unpaid Principal of the Defeased Note payable on the Stated Maturity Date (such payments, the "**Scheduled Defeasance Payments**").   Borrower, pursuant to the Security Agreement or other appropriate document, shall authorize and direct that the payments received from the U.S. Obligations may be made directly to Lender and applied to satisfy the obligations of Borrower under the Note or the Defeased Note, as applicable.   Any amounts received in respect of the U.S. Obligations in excess of the amounts necessary to make monthly payments hereunder shall be retained by Lender until payment in full of the Debt.  Semi–annual payments in respect of the U.S. Obligations shall be applied to the payments under the Note or the Defeased Note, as applicable, as the same become due thereunder.

(b)      Borrower shall deliver a copy of the Defeasance Notice to Natixis Real Estate Capital LLC, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, at the same time and in the same manner, as given to Lender.   In connection with a Defeasance of the Loan under this Section 2.3.3, Natixis, at its option, shall establish or designate a successor entity (the "**Successor Borrower**"), which Successor Borrower shall be a Special Purpose Entity acceptable to Lender and shall not own any other assets or have any other liabilities or operate any other property, except in connection with other defeased loans held in the same securitized pool with the Loan.  The right to establish or designate the Successor Borrower, as well as the right of the Successor Borrower to provide notice of prepayment pursuant to Section 2.3.4 hereof, shall be retained by Natixis (but may be assigned to an Affiliate) notwithstanding the sale, assignment or transfer of this Agreement unless such obligation is expressly assigned by Natixis and assumed by the transferee.  Borrower shall, in the case of a Full Defeasance, transfer and assign all obligations, rights and duties under and to the Security Agreement and to the Note or, in the case of a Partial Defeasance, transfer and assign all

15

obligations, rights and duties under and to the Security Agreement and to the Defeased Note, as applicable, together with the pledged U.S. Obligations to the Successor Borrower. The Successor Borrower shall assume all obligations under the Loan Documents and the Security Agreement, and Borrower shall be relieved of its obligations thereunder. Borrower shall pay a $1,000 fee to any such Successor Borrower as consideration for assuming such obligations. Notwithstanding anything herein to the contrary, no other assumption fee shall be payable upon a transfer of the Note or the Defeased Note, as applicable, in accordance with this Section 2.3.3, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses and ongoing fees and expenses incurred in connection with this Section 2.3.3.

**2.3.4  Permitted Prepayment.**   On the Open Prepayment Date or on any Payment Date thereafter prior to the Stated Maturity Date, Borrower shall have the right to pay the entire Debt upon ten (10) Business Days notice to Lender, without payment of the Yield Maintenance Premium and without effecting a Defeasance, provided that no Event of Default then exists.  If any such payment of the Debt pursuant to the preceding sentence is made on any date other than the Open Prepayment Date or any Payment Date thereafter prior to the Stated Maturity Date, such payment shall be accompanied by a payment in an amount equal to interest on the unpaid Principal through the end of the Interest Period during which such payment is made.

**2.4   Release of Property.**   Except as set forth in this Section 2.4, no repayment, prepayment or Defeasance shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Security Instrument.

**2.4.1  Release on Defeasance.**  If Borrower has elected a Full Defeasance, and the requirements of Section 2.3.3 have been satisfied, the Property shall be released from the Lien of the Security Instrument, and the U.S. Obligations pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Debt.  In connection with such release, Borrower shall submit to Lender, not less than twenty (20) days prior to the Defeasance Date, a form of release for execution by Lender appropriate in the State and reasonably satisfactory to Lender, and all other documentation Lender requires to be delivered by Borrower, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements and (ii) will effect such release in accordance with the terms of this Agreement.

**2.4.2  Release on Payment in Full.**  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release and satisfy or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever) the Lien of the Loan Documents if not theretofore released.

**2.5   Payments and Computations**.

**2.5.1  Making of Payments.**  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 11:00 a.m., New York City time, on the date such payment is

due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the immediately preceding Business Day.  All such payments shall be made irrespective of, and without any deduction, set–off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

2.5.2   **Computations.**  Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360–day year.

2.5.3   **Late Payment Charge.**  If any Principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, subject to any applicable grace or cure period, if any, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "***Late Payment Charge***"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

## 3.   **RESERVES.**

### 3.1   **Intentionally Omitted.**

### 3.2   **Required Repairs.**

3.2.1   **Completion of Required Repairs.**  Borrower shall perform and complete each item of the repairs and environmental remedial work at the Property described on **Schedule 2** (the "***Required Repairs***") within twelve (12) months of the date hereof or such shorter period of time for such item set forth on **Schedule 2**.

3.2.2   **Required Repairs Reserves.**  On the date hereof, Borrower shall deposit with Lender the aggregate amount set forth on **Schedule 2** as being required to complete the Required Repairs and Lender shall cause such amount to be transferred to a Subaccount (the "***Required Repairs Subaccount***").  Provided no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, accompanied by the following items (which items shall be in form and substance reasonably satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Required Repairs or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Required Repairs or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Required Repairs which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, a title search for the Property indicating that it is

free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained with respect to the portion of the Required Repairs which is the subject of the requested disbursement; and (v) such other evidence as Lender shall reasonably request that the Required Repairs which are the subject of the requested disbursement have been completed and paid for.

**3.3** **Taxes and Insurance.** Borrower shall pay to Lender on each Payment Date (i) one–twelfth of the Taxes that Lender estimates will be payable during the next twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (ii) one–twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies. Such amounts will be transferred by Lender to a Subaccount (the "***Tax and Insurance Subaccount***"). Provided that no Default or Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to <u>Sections 5.2</u> and <u>7.1</u>, provided that Borrower has promptly supplied Lender with notices of all Taxes and Insurance Premiums due, or (b) reimburse Borrower for such amounts upon presentation of evidence of payment and an Officer's Certificate in form and substance reasonably satisfactory to Lender; subject, however, to Borrower's right to contest Taxes in accordance with <u>Section 5.2</u>. In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Subaccount.

**3.4** **Capital Expense Reserves.** Borrower shall pay to Lender on each Payment Date an amount initially equal to $13,596.00. Lender will transfer such amount into a Subaccount (the "***Capital Reserve Subaccount***"). Additionally, upon thirty (30) days' prior notice to Borrower, Lender may reassess the amount of the monthly payment required under this <u>Section 3.4</u> from time to time in its reasonable discretion (based upon its then current underwriting standards). Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Capital Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided that (i) such disbursement is for an Approved Capital Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such Approved Capital Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used to pay or reimburse Borrower for Approved Capital Expenses and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used to pay the previously identified Approved Capital Expenses and (z) that any construction work associated with such Approved Capital Expenses has been

18

completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed documentation reasonably satisfactory to Lender as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender in connection with any construction work associated with such Approved Capital Expenses and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender.  Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Capital Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee on such Approved Capital Expenses.

**3.5**    **Intentionally Omitted.**

**3.5**    **Intentionally Omitted.**

**3.6**    **Intentionally Omitted.**

**3.7**    **Casualty/Condemnation Subaccount.**  Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "***Casualty/Condemnation Subaccount***") in accordance with the provisions of <u>Section 7</u>.   All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of <u>Section 7</u>.

**3.8**    **Intentionally Omitted.**

**3.9**    **Grant of Security Interest; Application of Funds.**   Lender will establish subaccounts which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "***Subaccounts***").  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in all Subaccounts created pursuant to this Agreement (collectively, the "***Cash Management Accounts***").  Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the payment of such Rents to Lender.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC financing statements, except those naming Lender as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Security Instrument or exercise its other rights under the Loan Documents.   Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Borrower shall be entitled to receive on a semi–annual basis interest on any balance in any Subaccounts other than Subaccounts established for the collection of Escrows at a rate equal to the U.S. and Regional Composite National Bank Average Retail Savings Money Market CD Yield, from time to time.  Upon repayment in full of

19

the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower.

**3.10**   **Intentionally Omitted**.

**3.11**   **Intentionally Omitted**.

**3.12**   **Common Charge Reserve Funds**.  Borrower shall deposit with Lender, (i) on the date hereof, an amount equal to $1,651,824.00, and (ii) on each Payment Date commencing with the Payment Date occurring in May 5, 2017, an amount (the "***Monthly Common Charge Deposit***") equal to the Common Charges that will be payable for the month in which such Payment Date occurs. Such amounts will be transferred by Lender to a Subaccount (the "***Common Charge Subaccount***")  Such deposit may be increased from time to time by Lender in such amount as Lender shall deem to be necessary in its reasonable discretion to reflect any increases in the Common Charges.    Notwithstanding anything in this <u>Section 3.12</u> to the contrary, so long as (i) no Event of Default hereunder shall have occurred and be continuing, (ii) Borrower has paid all Common Charges directly to the Condominium (as defined in the Condominium Documents) and Borrower provides Lender with evidence thereof at least thirty (30) days prior to the due date of such Common Charges (the foregoing clauses (i) and (ii) are hereinafter referred to as the "***Common Charge Escrow Waiver Requirements***"), then Borrower shall not be obligated to make deposits to the Common Charge Subaccount on account of Common Charges; provided however, from and after the date that any of the foregoing Common Charge Escrow Waiver Requirements fails to be satisfied and until such time as all of the Common Charge Escrow Waiver Requirements are satisfied again, Borrower shall be required to make deposits in the Common Charge Subaccount on account of Common Charges in accordance with the provisions of this <u>Section 3.12</u>.  Provided no Event of Default has occurred and is continuing, Lender shall apply the funds on deposit in the Common Charge Subaccount, if any, to payment of Common Charges. In making any payment relating to Common Charges, Lender may do so according to any bill, statement or estimate procured from the Condominium or its agent, without inquiry into the accuracy of such bill, statement or estimate.   Borrower shall provide invoices/statements for Common Charges to Lender not less than ten (10) days before such invoices/statements are due.

**3.13**   Notwithstanding anything to the contrary contained in this Article 3, after the occurrence of a Default or Event of Default, Lender may apply all Rents deposited into any Subaccount and other proceeds of repayment in such order and in such manner as Lender shall elect.

**4.**   **REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants to Lender as of the date hereof that:

**4.1**   **Organization; Special Purpose.**   Borrower has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged.  Borrower is duly qualified to do business and is in good standing in each jurisdiction

20

where it is required to be so qualified in connection with its properties, business and operations. Borrower is a Special Purpose Entity.

**4.2** **Proceedings; Enforceability.** Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents. The Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity. The Loan Documents are not subject to, and Borrower has not asserted, any right of rescission, set–off, counterclaim or defense, including the defense of usury. No exercise of any of the terms of the Loan Documents, or any right thereunder, will render any Loan Document unenforceable.

**4.3** **No Conflicts.** The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties. Borrower's rights under the Licenses and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender. Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of the Loan Documents has been obtained and is in full force and effect.

**4.4** **Litigation.** There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower, the Manager or the Property, which, if adversely determined, might materially adversely affect the condition (financial or otherwise) or business of Borrower, Manager or the condition or ownership of the Property.

**4.5** **Agreements.** Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower or the Property, or Borrower's business, properties, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

**4.6** **Title.** Borrower has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid. The Security Instrument when properly recorded in the appropriate records, together with any UCC

Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's  interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances.  All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid.  The Permitted Encumbrances do not materially adversely affect the value, operation or use of the Property, or Borrower's ability to repay the Loan.  No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or part of the Property or for the relocation of roadways providing access to the Property.  There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.  There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property.  The survey for the Property delivered to Lender does not fail to reflect any material matter affecting the Property or the title thereto.  All of the Improvements included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvement on an adjoining property encroaches upon the Property, and no easement or other encumbrance upon the Property encroaches upon any of the Improvements, except those insured against by the title insurance policy insuring the Lien of the Security Instrument.  Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property.   There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, or any contemplated improvements to the Property that may result in such special or other assessments.

**4.7**     **No Bankruptcy Filing.**  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against it.  In addition, neither Borrower nor any principal nor Affiliate of Borrower has been a party to, or the subject of a Bankruptcy Proceeding for the past ten years.

**4.8**     **Full and Accurate Disclosure.**  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein.  Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long–term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this

Agreement.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

**4.9**     **No Plan Assets.**     Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3–101.

**4.10**     **Compliance.**     Borrower and the Property and the use thereof and the Condominium comply in all material respects with all applicable Legal Requirements (including with respect to parking and applicable zoning and land use laws, regulations and ordinances) other than the Violations.  Borrower is not and the Condominium Documents in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.  The Property is used exclusively for a multifamily cooperative apartment complex and other appurtenant and related uses.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the best of Borrower's knowledge, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the "*Licenses*"), have been obtained and are in full force and effect.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

**4.11**     **Contracts.**     There are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium.  All service, maintenance or repair contracts affecting the Property have been entered into at arms–length in the ordinary course of Borrower's business and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

**4.12**     **Federal Reserve Regulations; Investment Company Act.**     No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.  Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

23

**4.13**   **Utilities and Public Access.**   The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses.  All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right–of–way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement.  All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.14**   **Physical Condition.**   The Property, including all Improvements, parking facilities, systems, Equipment and landscaping, are in good condition, order and repair in all material respects; there exists no structural or other material defect or damages to the Property, whether latent or otherwise.  Borrower has not received notice from any insurance company or bonding company of any defect or inadequacy in the Property, or any part thereof, which would adversely affect its insurability or cause the imposition of extraordinary premiums or charges thereon or any termination of any policy of insurance or bond.  No portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards.

**4.15**   **Leases.**   Borrower has delivered to Lender a true, correct and complete rent roll for the Property (the "***Rent Roll***"), which includes all Leases affecting the Property.  Except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) the Tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises, have commenced the payment of rent under the Leases, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Leases have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the Tenant thereunder for an adjustment to the rent; (v) no Tenant has made any claim against the landlord in writing under any Lease which remains outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) to Borrower's best knowledge, there is no present material default by the Tenant under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll and are held consistent with Section 3.8; (viii) Borrower is the sole owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of  Borrower and the applicable Tenant thereunder; (x) no Person has any possessory interest in, or right to occupy, the Property except under the terms of a Lease; and (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement. None of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof.  Neither the Leases nor the Rents have been assigned or pledged except to Lender, and no other Person has any interest therein except the Tenants thereunder.

**4.16**   **Fraudulent Transfer.**   Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated,

disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**4.17**     **Ownership of Borrower.**  The organizational chart attached hereto as **Schedule 3** is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

**4.18**     **Management Agreement.**    The Management Agreement is in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto. The management fees and the terms and provisions of the Management Agreement, are subordinate to the Loan Documents.

**4.19**     **Hazardous Substances.**    (i) The Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean–up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right–to–Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any Legal Requirements relating to Toxic Mold, any state super–lien and environmental clean–up statutes, any local law requiring related permits and licenses, any common law relating to Toxic Mold or other Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic or dangerous substances, wastes, contaminants, and pollutants, including, without limitation, petroleum, petroleum products, crude oil and fractions thereof, Toxic Mold, or any other substances or materials which are included under or regulated by, or for which liability may arise pursuant to, Environmental Laws (collectively, "***Hazardous Substances***"); (iii) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

AmericasActive:8841688.17

**4.20    Principal Place of Business.**  The principal place of business of Borrower is its primary address for notices as set forth in Section 6.1, and Borrower has no other place of business.

**4.21    Other Debt.**  There is no indebtedness with respect to the Property or any indebtedness secured over excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.22    Embargoed Person.**  None of the funds or assets of Borrower, constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined) and no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, with the result that the investment in Borrower, (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

**4.23    Anti–Money Laundering.**  None of the funds of Borrower, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**4.24    Condominium Documents.**

(a)    Borrower has delivered or caused to be delivered to Lender true, correct and complete copies of each of the Condominium Documents.

(b)    The Condominium Declaration is in full force and effect and has not been amended or revised other than as recorded as of the date hereof.

(c)    Borrower has not made any assignments of, or granted any security interests in, the Condominium Declaration or in its rights, benefits or privileges thereunder to anyone other than Lender.

(d)    The interest of Borrower in the Condominium Declaration is not subject to any claim, setoff, lien, deduction or encumbrance of any nature.

(e)    Borrower is not presently in default in the performance of any of its obligations under the Condominium Declaration, and Borrower has no knowledge of any act, omission, occurrence or circumstance which, with the giving of notice or the passage of time or both, would result in such a default.

(f)    The Board currently consists of five (5) directors and Borrower has no plans to request the expansion of the number of directors serving on the Board and has no knowledge of any plans by the Condominium Association or any other Person to expand the number of directors serving on the Board.

26

(g)     Borrower, is as of the date hereof, entitled to appoint four (4) directors to the Board.  Borrower has appointed Debbie Vazquez, Elizabeth Ziangus, Umair Sheikh, and Antoine (Tony) Marzoukaas directors of the Board.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.19 shall survive in perpetuity.

**4.25    Offering Plan**.

(a)     Borrower has delivered or caused to be delivered to Lender true, correct and complete copies of the Offering Plan.

(b)     The Offering Plan is in full force and effect and has not been amended or revised other than as recorded as of the date hereof.

(c)     Borrower has not made any assignments of, or granted any security interests in, the Offering Plan or in its rights, benefits or privileges thereunder to anyone other than Lender.

(d)     Borrower is not presently in default in the performance of any of its obligations under the Offering Plan, and Borrower has no knowledge of any act, omission, occurrence or circumstance which, with the giving of notice or the passage of time or both, would result in such a default.

**5.    COVENANTS**

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

**5.1    Existence.**  Borrower shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

**5.2    Taxes.**  Borrower shall pay all Taxes as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender pursuant to Section 3.3).  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien against the Property, and shall promptly pay for all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall

27

suspend the collection of the Taxes, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (v) (v) Borrower shall have furnished such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure the payment of any such Taxes (it being agreed that Lender shall take into account any applicable funds in the Tax and Insurance Subaccount), together with all interest and penalties thereon, which shall not be less than one hundred twenty–five percent (125%) of the Taxes being contested and other changes being contested unless Borrower has paid such Taxes in full (together with all interest and penalties thereon) in which case no additional security shall be required,, and (vi) Borrower shall promptly upon final determination thereof pay the amount of such Taxes, together with all costs, interest and penalties.  Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

### 5.3     Repairs; Maintenance and Compliance; Alterations.

**5.3.1   Repairs; Maintenance and Compliance.**  Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.3.2 and normal replacement of Equipment with Equipment of equivalent value and functionality).  Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within one Business Day after Borrower first receives notice of any such non–compliance. Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair.

**5.3.2   Alterations.**     Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or Net Operating Income of the Property and (iii) are in the ordinary course of Borrower's business.  Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration the cost of which is reasonably estimated to exceed $1,000,000 or which is likely to result in a decrease of Net Operating Income by two and one–half percent (2.5%) or more for a period of thirty (30) days or longer.  Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred twenty–five percent (125%) of the cost of the Material Alteration as reasonably estimated by Lender.   Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in a good and workmanlike manner and in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material

28

Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of Tenant improvement work) have been issued.  Borrower shall reimburse Lender upon demand for all out–of–pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.3.2.

5.4     **Performance of Other Agreements.**  Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents.

5.5     **Cooperate in Legal Proceedings.**  Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

5.6     **Further Assurances.**  Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve or protect the collateral at any time securing or intended to secure the Debt or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; and (ii) upon Lender's request therefor given from time to time after the occurrence of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

5.7     **Environmental Matters**.

5.7.1     **Hazardous Substances.**  So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in direct or indirect violation of any Environmental Laws or (C) any condition on or near the Property might pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances or cure such violations or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's sole expense.  Any removal, remediation or cure of any violation relating to Toxic Mold shall include, without limitation, all acts required to clean and disinfect any portions of the Property affected by Toxic Mold and to eliminate the source(s) of Toxic Mold in or on the Property, including providing any necessary moisture control systems at the Property. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal, remediation or cure.

29

### 5.7.2 **Environmental Monitoring**.

(a)     Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b)     Upon Lender's request, upon a reasonable belief  by Lender that Borrower may be in material violation of, or may have material liability under, Environmental Laws, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender ("***Lender's Consultant***"), reasonable in scope based upon the circumstances of the request, assessing, as relevant based upon such circumstances, the presence or absence of Hazardous Substances on, in or near the Property, and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower.  Such inspections and audit may include soil borings and ground water monitoring if such investigations are reasonable in scope based upon the circumstances.  If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)     If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender.  If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall commence all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law.   All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender.  All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work.  If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense.   Notwithstanding the foregoing, Borrower shall not be required to

commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work.  Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred twenty–five percent (125%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.

(d)  Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.8**  **Title to the Property; Liens.**  Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any Lien on any direct or indirect legal or beneficial ownership interest in Borrower, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

**5.9**  **Leases.**  Borrower shall not enter into any Leases without Lender's prior written consent.

**5.9.1**  **Generally.**  Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect.  All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to then existing local market rates and shall be arm's length transactions with bona fide, independent third–party Tenants.

**5.9.2**  **Material Leases.**  Borrower shall not enter into a proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.  Prior to seeking Lender's consent to any Material Lease,

AmericasActive:8841688.17

Borrower shall deliver to Lender a copy of such proposed Material Lease (a "***Proposed Material Lease***") blacklined to show changes from the standard form of Lease approved by Lender and then being used by Borrower.  Lender shall approve or disapprove each Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease for which Lender's approval is required under this Agreement within ten (10) Business Days of the submission by Borrower to Lender of a written request for such approval, accompanied by a final copy of the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.  If requested by Borrower, Lender will grant conditional approvals of a Proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease if subsequent to any preliminary approval material changes are made to the terms previously approved by Lender, or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.  Provided that no Event of Default is continuing, if Borrower provides Lender with a written request for approval (which written request shall specifically refer to this <u>Section 5.9.2</u> and shall explicitly state that failure by Lender to approve or disapprove within ten (10) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within ten (10) Business Days after receipt by Lender of the request, the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease shall be deemed approved by Lender, and Borrower shall be entitled to enter into such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease. Notwithstanding the foregoing, Borrower shall have the right, absent the continuance of an Event of Default, to enter into one or more Proprietary Leases, which Proprietary Leases shall be in the form attached hereto as Exhibit "A", provided each such new Proprietary Lease is entered into in accordance with a separate Proprietary Lease Transfer.

### 5.9.3   <u>Intentionally Omitted</u>.

### 5.9.4   <u>Additional Covenants with respect to Leases</u>.

Borrower  (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt;  (ii) shall once per calendar quarter prepare and deliver to Lender a list of each tenant that is in default under its Lease, and shall upon, written request by Lender send copies to Lender of all notices of default that Borrower shall have sent during the previous calendar quarter; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv)  shall not collect any of the Rents more than one month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Material Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to

a subletting, may not, so long as no Event of Default is continuing, be unreasonably withheld or delayed; and  (ix) shall not cancel or terminate any Lease or accept a surrender thereof without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.  Notwithstanding the foregoing, Borrower shall be permitted, to terminate a Proprietary Lease without Lender consent so long as (x) (i) no Event of Default is continuing, (ii) notice of such termination is provided to Lender in writing, (iii) such termination is done in the ordinary course of business, and (iv) such termination was the result of a default by the Tenant under such Proprietary Lease, or (y) such termination is the result of a permitted Proprietary Lease Transfer.

**5.10   Estoppel Statement.**   After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, (v) that no Default or Event of Default exists under the Loan Documents, and (vi) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.   Lender shall provide its estimate of the unpaid Principal upon written request of Borrower.

**5.11   Property Management**.

**5.11.1 Management Agreement.**   Borrower shall (i) cause the Property to be managed pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by Borrower under the Management Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  Without Lender's prior written consent, which shall not be unreasonably withheld or delayed, Borrower shall not (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (except pursuant to Section 5.11.2), provided however, that so long as no Event of Default has occurred and is continuing, and Borrower is not otherwise required to terminate the Management Agreement pursuant to Section 5.11.2, Borrower shall have the right to renew the Management Agreement without Lender's prior written consent so long as such renewal is on the same terms and conditions that exist pursuant to the Management Agreement on the date hereof and Borrower delivered to Lender a copy of such renewal; (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; or (e) suffer or permit the occurrence and continuance of a default beyond any applicable cure period under the Management Agreement (or any successor management agreement) if such default permits the Manager to terminate the Management Agreement (or such successor management agreement).

AmericasActive:8841688.17

**5.11.2  Termination of Manager.**  If (i) Borrower fails to maintain a Debt Service Coverage Ratio of at least 1.10:1, (ii) a Bankruptcy Action occurs with respect to Manager, (iii) an Event of Default shall be continuing, or (iv) Manager is in default under the Management Agreement, Borrower shall, at the request of Lender, terminate the Management Agreement and replace Manager with a replacement manager acceptable to Lender in Lender's reasonable discretion and the applicable Rating Agencies on terms and conditions satisfactory to Lender and the applicable Rating Agencies unless, in the case of the event described in clause (i) only, Borrower shall defease a portion of the unpaid Principal to a level such that the Debt Service Coverage Ratio of the unpaid Principal is restored to a level of not less than 1.10:1.  All calculations of Debt Service Coverage Ratio for purposes of this Section 5.11.2 shall be subject to verification by Lender.  Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default.  Borrower may from time to time appoint a successor manager to manage the Property, which successor manager and Management Agreement shall be approved in writing by Lender in Lender's discretion and the applicable Rating Agencies.

**5.12   Special Purpose Entity.**  Borrower shall at all times be a Special Purpose Entity. A "*Special Purpose Entity*" shall have the meaning set forth on **Schedule 4** hereto.  Borrower covenants and agrees that Borrower shall provide Lender with thirty (30) days' prior written notice prior to the removal of an Independent Director or Independent Manager, as applicable, of Borrower.

**5.13   Assumption in Non–Consolidation Opinion.**  Borrower shall each conduct its business so that the assumptions (with respect to each Person) made in that certain substantive non–consolidation opinion letter dated the date hereof delivered by Borrower's counsel in connection with the Loan, shall be true and correct in all respects.

**5.14   Change In Business or Operation of Property.**  Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as a Multifamily cooperative apartment complex property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**5.15   Certain Prohibited Actions.**  Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice; (ii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment; (iii) Transfer any License required for the operation of the Property; or (iv) maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

AmericasActive:8841688.17

     **5.16**    <u>**Prohibited Transfers.**</u>  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.  Notwithstanding the foregoing, Lender shall not unreasonably withhold its consent to a sale of the Property in its entirety (a "***Special Transfer***") to a Special Purpose Entity with organizational documents containing provisions satisfying Lender's then–current requirements of a Special Purpose Entity and otherwise acceptable to Lender (a "***Buyer***"), provided that:

        (a)     No Default or Event of Default is then continuing;

        (b)     Borrower gives Lender written notice of the terms of such prospective Special Transfer not less than sixty (60) days before the date on which such sale is scheduled to close, accompanied by all information concerning the proposed Buyer as Lender would require in evaluating an initial extension of credit to a borrower and such reasonable non–refundable application fee as shall be required by Lender.  Lender shall have the right to approve or disapprove the proposed Buyer in its reasonable discretion (it being acknowledged that Lender may, as a condition to approving any proposed Buyer, require a Rating Comfort Letter from each of the Rating Agencies);

        (c)     Borrower pays Lender, concurrently with the closing of such Special Transfer, a non refundable assumption fee in an amount equal to all out–of–pocket costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Lender in connection with the Special Transfer plus an amount equal to (i) one-half of one percent (0.5%) of the then outstanding Principal on the first such completed Special Transfer, or (ii) one percent (1.0%) of the then outstanding Principal on each completed Special Transfer thereafter;

        (d)     Buyer assumes all of the obligations of Borrower under this Agreement, the Note and the other Loan Documents and, prior to or concurrently with the closing of such Special Transfer, Buyer executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption and delivers such legal opinions as Lender may require;

        (e)     Borrower and Buyer execute and cause to be filed in such public records as Lender deems appropriate, without any cost or expense to Lender, new financing statements or financing statement amendments and any additional documents reasonably requested by Lender;

        (f)     Borrower causes to be delivered to Lender, without any cost or expense to Lender, such endorsements to Lender's title insurance policy, property and liability insurance endorsements or certificates and other similar materials as Lender may deem necessary at the time of the Special Transfer, all in form and substance satisfactory to Lender, including, without limitation, an endorsement or endorsements to Lender's title insurance policy insuring the Lien of the Security Instrument, extending the effective date of such policy to the date of execution and delivery (or, if later, of recording) of the assumption agreement referenced above in clause (d) of this <u>Section 5.16</u>, with no additional exceptions added to such policy and insuring that fee simple title to the Property is vested in Buyer;

AmericasActive:8841688.17

(g)     Borrower executes and delivers to Lender, without any cost or expense to Lender, a release of Lender, its officers, directors, employees and agents, from all claims and liability relating to the transactions evidenced by the Loan Documents through and including the date of the closing of the Special Transfer, which agreement shall be in form and substance satisfactory to Lender and shall be binding upon Buyer;

(h)     Such Special Transfer is not construed so as to relieve Borrower of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer and Borrower executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate the ratification of said personal liability.  Borrower shall be released from and relieved of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

(i)     Such Special Transfer is not construed so as to relieve any guarantor of its obligations under any Loan Document, until a direct or indirect member, partner or shareholder of Buyer approved by Lender in its sole discretion (a "***Successor Guarantor***") assumes the obligations of such guarantor and executes such documents as may be required by Lender to evidence such assumption;

(j)     Buyer has furnished to Lender all appropriate documents and instruments evidencing Buyer's capacity and good standing, and the authority of the signers to execute the assumption of the Loan and the Loan Documents, which documents and instruments shall include certified copies of all documents and instruments relating to the organization and formation of Buyer and of the entities, if any, which are direct or indirect members, partners or shareholders of Buyer, all of which shall be satisfactory to Lender;

(k)     Buyer shall assume the obligations of Borrower under any management agreements pertaining to the Property, or shall cause the new manager and management agreement to satisfy the requirements of Section 5.11 hereof, as applicable;

(l)     Buyer shall furnish an opinion of counsel satisfactory to Lender that the acquisition of the Property and the assumption of the Loan and the Loan Documents by Buyer and, to the extent applicable, Successor Guarantor, was validly authorized, and duly executed and delivered, and constitutes the legal, valid and binding obligations of Buyer and Successor Guarantor, enforceable against each of them in accordance with their respective terms, and with respect to such other matters as Lender may require; and

(m)     Buyer shall provide Lender with a fully executed copy of (1) a deed covering the Property, (2) a bill of sale covering the personal property constituting a part of the Property and (3) an assignment and assumption agreement in respect of the Leases, in form and substance reasonably satisfactory to Lender.

     **5.17**    <u>**Expenses**</u>.  Borrower shall reimburse Lender upon receipt of notice for all reasonable out–of–pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Lender or Borrower; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens on the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Rating Agencies in connection with the Loan or any modification thereof; (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work–out", or any insolvency or bankruptcy proceedings and (x) the fees and expenses of any special servicer retained in respect of the Loan.  Any costs and expenses due and payable to Lender hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in any of the Subaccounts, with notice thereof to Borrower.  The obligations and liabilities of Borrower under this <u>Section 5.17</u> shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

     **5.18**    <u>**Indemnity**</u>.  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument or any of the other Loan Documents, or the Property or any interest

37

therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder if and to the limited extent that it is finally judicially determined that such Indemnified Liabilities arose solely from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this <u>Section 5.18</u> shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.  The obligations and liabilities of Borrower under this <u>Section 5.18</u> shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.19**  **Embargoed Person.**  (a)  At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or assets of Borrower, whether or not used to repay the Loan, shall constitute property of, or shall be beneficially owned directly or, to Borrower's best knowledge, indirectly, by any person, entity or government subject to sanctions or trade restrictions under United States law ("***Embargoed Person***" or "***Embargoed Persons***") that are identified on (A) the "List of Specially Designated Nationals and Blocked Persons" maintained by the Office of Foreign Assets Control ("***OFAC***"), U.S. Department of the Treasury's FINCEN list, or to Borrower's best knowledge, as of the date thereof, based upon reasonable inquiry by Borrower, on any other similar list maintained by OFAC or FINCEN pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Borrower, as applicable (whether directly or indirectly), is prohibited by law, or the Loan made by Lender would be in violation of law, or (B) Executive Order 13224 (September 23, 2001) issued by the President of the United States ("Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), any related enabling legislation or any other similar Executive Orders, and (ii) no Embargoed Person shall have any direct interest or, to Borrower's best knowledge, indirect interest, of any nature whatsoever in Borrower, with the

result that the investment in Borrower, (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

(b)     At all times throughout the Term of the Loan, neither Borrower, nor any Person Controlling, Controlled by or under common Control with any of Borrower, nor any Person having a beneficial interest in, or for whom Borrower acting as agent or nominee in connection with the investment, is (a) a country, territory, person or entity named on an OFAC or FINCEN list, or is a Person that resides in or has a place of business in a country or territory named on such lists; (b) a Person residing in, or organized or chartered under the laws of a jurisdiction identified as non–cooperative by the Financial Action Task Force ("*FATF*"); or (c) a Person whose funds originate from or will be routed through , an account maintained at a foreign shell bank or "offshore bank."

(c)     Neither Borrower, nor any Person Controlling, Controlled by or under common Control with Borrower, is a "senior foreign political figure" or an "immediate family" member or "close associate" (as all such terms are defined below) of a senior foreign political figure within the meaning of the USA PATRIOT Act (i.e., the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107–56, as may be amended).  For the purposes of this subsection (c), (i) "senior foreign political figure" means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party or a senior executive of a foreign government–owned corporation, and such term also includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure, (ii) "immediate family" of a senior foreign political figure includes the figure's parents, siblings, spouse, children and in–laws, and (iii) "close associate" of a senior foreign political figure means a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

**5.20    Anti–Money Laundering.**  At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, none of the funds of Borrower, that are used to consummate this transaction or to repay the Loan shall be derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**5.21    ERISA.**  At all times throughout the Term, upon the request of Lender or any of Lender's successors, assigns or participants in the Loan, the management of Borrower shall consult with Lender or any of Lender's successors, assigns or participants on significant business issues relating to the operation of the Property and make itself available quarterly either personally or by telephone at mutually agreeable times for such consultation; provided, however, that such consultation need not result in any change in Borrower's course of action, subject to Section 8.1.  The aforementioned consultation rights are intended to satisfy the requirement of

management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3–101.

**5.22**     **Condominium Units**.  For so long as the Loan remains outstanding, Borrower shall not sell and/or transfer any of the Units (as defined in the Condominium Declaration).

**5.23**     **Violations**.  Borrower shall use commercially reasonable efforts to (a) remove, or cause to be removed, of record any and all violations (including, without limitation, the payment of any fines, charges or penalties required to remove same) listed on Schedule 5, attached hereto and made a part hereof (the "***Violations***"), issued by either (x) the New York City Department of Buildings, (y) the New York City Department of Housing, and (z) New York City Environmental Control Board, presently existing, if any, (b) complete any and all repairs that are required to be made and work performed at the Property in order to remediate such Violations (such repairs and work are referred to herein as the "*Work*"), and (c) deliver to Lender evidence in form and substance reasonably acceptable to Lender of the completion of all of the Work and removal of record of all of the Violations (the foregoing clauses (a), (b) and (c) are referred to collectively as the "***Completion Conditions***"), provided however, that Borrower shall be required within ninety (90) days of the date hereof to satisfy the Completions Conditions with respect to those Violations marked "IMMEDIATE REMEDIATION REQUIRED" on Schedule 5.

**5.24**     **Lead Based Paint Program**.  Borrower covenants and agrees to continue to maintain a Lead Based Paint Operations and Maintenance Program, prepared and designed by a consultant reasonable acceptable to Lender (the "**Lead-Based Paint Maintenance Program**" ), with respect to lead-based paint that is consistent with the United States Department of Housing and Urban Development guidelines, other relevant guidelines and with applicable state and local laws and such Lead-Based Paint Maintenance Program will hereafter continuously remain in effect until the Debt is repaid in full.  In furtherance of the foregoing, Borrower shall inspect and maintain all painted surfaces on a regular basis and ensure that all painted surfaces within the interior and exterior of the Property shall be maintained in a condition that prevents exposure of residents to lead-based paint at all times and to the extent Borrower is required by any governmental agency or authority to remove and/or abate lead-based paint at the Property, Borrower shall remove and/or abate same as and when required by said governmental agency or authority and otherwise in compliance with all Environmental Laws.  Without limiting the generality of the preceding sentence, Lender may require (i) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (ii) an amendment to such Lead-Based Paint Maintenance Program to address changing circumstances, laws or other matters, (iii) at Borrower' s sole expense, supplemental examination of the Property by consultants specified by Lender, and (iv) variation of the Lead-Based Paint Maintenance Program in response to the reports provided by any such consultants.

**5.25**     **ACM Maintenance Program**.  Borrower shall, during the term of the Loan, including any extension or renewal thereof, comply in all material respects with the terms and conditions of that certain Asbestos Containing Materials Operations and Maintenance Plan, designed by Partner Engineering and Science, Inc., dated as of March 28, 2017, (the "***ACM Maintenance Program***"), with respect to asbestos containing materials ("***ACM's***"), consistent with "Guidelines for Controlling Asbestos-Containing Materials in Buildings" (USEPA, 1985) and other relevant guidelines, and with applicable state and local laws, and such ACM

40

Maintenance Program will hereafter continuously remain in effect until the Debt is repaid in full. In furtherance of the foregoing, Borrower shall inspect and maintain all ACM's on a regular basis and ensure that all ACM's shall be maintained in a condition that prevents exposure of occupants to ACM's at all times.  Without limiting the generality of the preceding sentence, Lender may require (i) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (ii) an amendment to such ACM Maintenance Program to address changing circumstances, laws or other matters, (iii) at Borrower's sole reasonable expense and no more than once per calendar year (absent an Event of Default) supplemental examination of the Property by consultants specified by Lender, and (iv) variation of the ACM Maintenance Program in response to the reports provided by any such consultants.

**5.26**   **Offering Plan**. Borrower shall not (and shall not permit) amend, modify or supplement the Offering Plan without the prior written consent of Lender, except to correct errors that are clearly clerical in nature.

## 6.   NOTICES AND REPORTING.

**6.1**   **Notices.**   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party):  If to Lender: Natixis Real Estate Capital LLC, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, Telecopier: (212) 891–5777 with copies to: Winston & Strawn, LLP, 200 Park Avenue, New York, New York 101566; Attention: Corey A. Tessler, Esq., Telecopier: 212 -294-4700; if to Borrower: c/o Metropolitan Pacific Properties, Inc., 21-77 33rd Street, Astoria, New York 11105, Attention: Steve Osman, Telecopier: (718) 626-1903, with a copy to: DeJesu Maio & Associates, PC, 191 New York Avenue, Huntington, New York 11743, Attention: Joseph DeJesu, Esq.; Telecopier: (631) 504-0692.  A Notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (c) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (d) in the case of facsimile transmission, when sent and electronically confirmed.

**6.2**   **Borrower Notices and Deliveries.**   Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender.  In addition, after request by Lender (but no more frequently than

41

twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, Tenant estoppel certificates addressed to Lender, its successors and assigns from each Tenant at the Property in form and substance reasonably satisfactory to Lender.

**6.3**      **Financial Reporting**.

**6.3.1    Bookkeeping.**    Borrower shall keep on a calendar year basis, in accordance with GAAP or any other accounting method, consistently applied, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Manager or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall reasonably require.  After an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2    Annual Reports.**    Borrower shall furnish to Lender annually within ninety (90) days after each calendar year, a complete copy of Borrower's annual financial statements audited by a "big four" accounting firm or another certified public accountant (it being agreed that Meyer M. Lieber shall be deemed an acceptable accountant for the purposes of this Section 6.3.2 so long as (i) such accountant is not the subject of a bankruptcy or insolvency proceeding, (ii) a material adverse change does not occur with respect to such accountant and (iii) the financial statements and reports provided by such accountant under this Agreement continue to comply in all material respects with the requirements of this Agreement with respect thereto) (accompanied by an unqualified opinion from such accounting firm or independent certified public accountant)  in form and content reasonably acceptable to Lender, prepared in accordance with GAAP or any other accounting method, consistently applied, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may reasonably request.   Each such statement (x) shall be in form and substance reasonably satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual Net Operating Income as well as (1) a list of Tenants, if any, occupying more than twenty percent (20%) of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and a cumulative basis and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate in all material respects and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP or any other accounting method consistently applied and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

AmericasActive:8841688.17

      **6.3.3**   **Monthly/Quarterly Reports.**   Borrower shall furnish to Lender within twenty (20) days after the end of each calendar month or quarter, as applicable, the following items: (i) monthly (provided, however, that monthly reports shall only be required prior to "start-up day" (within the meaning of Section 860G(a)(9) of the Code) of the securitization that the Loan is placed) and year–to–date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP or any other accounting method, consistently applied to fairly represent the financial position and results of operation of the Property during such calendar month, all in form reasonably satisfactory to Lender; (ii) quarterly, a balance sheet for such calendar quarter; (iii) quarterly, a comparison of the budgeted income and expenses and the actual income and expenses for each quarter and year–to–date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year to date; (iv) quarterly, a statement of the actual Capital Expenses made by Borrower during each calendar quarter as of the last day of such calendar quarter; (v) quarterly, a statement that Borrower has not incurred any indebtedness other than indebtedness permitted hereunder; and (vi) quarterly, an aged receivables report.  Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP or any other accounting method, consistently applied (subject to normal year–end adjustments) and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

      **6.3.4**   **Other Reports.**   Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower or Manager as may be reasonably requested by Lender or any applicable Rating Agency.

      **6.3.5**   **Annual Budget.**   Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender by November 15th of each year during the Term for approval by Lender, which approval shall not be unreasonably withheld or delayed, a proposed pro forma budget for the Property for the succeeding calendar year (the "*Annual Budget*"), and, promptly after preparation thereof, any revisions to such Annual Budget.  Lender's failure to approve or disapprove any Annual Budget or revision within thirty (30) days after Lender's receipt thereof shall be deemed to constitute Lender's approval thereof.  The Annual Budget shall consist of (i) an operating expense budget (the "*Operating Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of Borrower's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain or increase any monthly payments required hereunder, and (ii) a Capital Expense budget (the "*Capital Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of anticipated Capital Expenses.

      **6.3.6**   **Breach.**   If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "*Required Records*") required by this Section 6.3 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $10,000 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure.  In addition, thirty (30) days after Borrower's

failure to deliver any Required Records, Lender shall have the option, upon fifteen (15) days notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

## 7.   INSURANCE; CASUALTY; AND CONDEMNATION

### 7.1   Insurance.

**7.1.1   Coverage.**  Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

(a)      Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including fire, lightning, flood (if applicable), earthquake (if applicable), windstorm/hail, vandalism, and malicious mischief, boiler and machinery and coverage for damage or destruction caused by "War", if available, and the acts of terrorists, both foreign and domestic, whether considered "certified" under applicable laws and legislation or otherwise (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the Property in nature, use, location, height, and type of construction.  Such insurance policy shall also provide coverage for Ordinance or Law, coverage for loss to the undamaged portion of the Improvements, demolition and increased cost of construction (which insurance for demolition and increased cost of construction may contain a sub–limit satisfactory to Lender).  Each such insurance policy shall (i) be in an amount equal to the greater of (A) one hundred percent (100%) of the then replacement cost of the Improvements without deduction for physical depreciation, and (B) such amount as is necessary so that the insurer would not deem Borrower a co–insurer under such policies, (ii) have deductibles no greater than $10,000 per occurrence, (iii) be paid annually in advance and (iv) contain either no coinsurance or an agreed amount endorsement and (v) a replacement cost endorsement with a waiver of depreciation, and shall cover, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to any Lease on a replacement cost basis.  If the insurance required under this subsection is not obtained by blanket insurance policies, the insurance policy shall be endorsed to also provide guaranteed building replacement cost to the Improvements and such Tenant improvements in an amount to be subject to the consent of Lender, which consent shall not be unreasonably withheld, but in all events, not less than would be required to restore the Property following a Casualty.  If policy is written as part of a blanket, Borrower will provide Lender with a complete schedule of locations and values for properties associated with the blanket policy.  Lender shall be named Mortgagee and Lender's Loss Payee on a Standard Mortgagee Endorsement.

(b)      Flood insurance if any part of the Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, in an amount at least equal to the lesser of: (i) the greater of (A) the then full replacement cost of the Property without deduction for physical depreciation and (B) the unpaid Principal and (ii) the maximum limit of coverage available under the National Flood Insurance Plan with respect to the Property; provided, however, that Lender shall be entitled to require flood insurance in amounts greater than the foregoing, in its discretion.  If flood insurance is required, the maximum deductible allowable on the primary layer of coverage shall be $10,000.

(c)     Public liability insurance, including terrorism, to be written on an occurrence basis with no deductible or self–insured retention on the General Liability, including (i) "Commercial General Liability Insurance", (ii) "Owned", "Hired" and "Non Owned Auto Liability"; and (iii) umbrella liability coverage for personal injury, bodily injury, death, accident and property damage, such insurance providing in combination not less than $1,000,000 per occurrence, not less than $2,000,000 in the annual aggregate and not less than $50,000,000.00 umbrella, each on a per location basis.  If aggregate limits are shared with other locations the coverage shall include either (A) a "Per Location Aggregate Endorsement" or (B) the amount of umbrella liability insurance to be provided shall be not less than $5,000,000 in excess of the umbrella coverage set forth in the preceding sentence.  The policies described in this subsection shall also include coverage for elevators, escalators, independent contractors, "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), "Products" and "Completed Operations Liability" coverage.

(d)     Rental loss or business interruption insurance including terrorism (i) with Lender being named as "Lender Loss Payee", (ii) in an amount equal to one hundred percent (100%) of the projected Rents from the Property during the period of restoration but not less than twelve (12) months; and (iii) containing an extended period of indemnity endorsement of not less than six (6) months which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of eighteen (18) months from the date that the Property is damaged, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such insurance shall be increased from time to time during the Term as and when the estimated or actual Rents increase.

(e)     To the extent such equipment exists on the Property, comprehensive boiler and machinery insurance covering all mechanical and electrical equipment against physical damage, rent loss and improvements loss and covering, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to the lease on a replacement cost basis or such other amount as approved by Lender in its discretion.

(f)     Worker's compensation insurance with respect to any employees of Borrower, as required by any Legal Requirement.

(g)     During any period of repair or restoration, builder's "all–risk" insurance on a "Completed Value Basis" in an amount equal to not less than the full, completed insurable value of the Property, against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as Lender may request, in form and substance acceptable to Lender, and consistent with the insurance requirements set forth in Section 7.1.1(a).

(h)     Such other insurance or higher limits on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be reasonably required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, sinkhole, mine subsidence and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

AmericasActive:8841688.17

### 7.1.2   **Policies.**

(a)      Unless otherwise approved by Lender in writing in advance of placement, all policies of insurance (the "*Policies*") required pursuant to Section 7.1.1 shall (i) be issued by companies approved by Lender and licensed and/or authorized to do business in the State, with a claims paying ability rating of "A" or better by S&P (and the equivalent by any other Rating Agency) and a rating of A:X or better in the current Best's Insurance Reports; (ii) name Lender and its successors or assigns as their interests may appear as the Mortgagee (in the case of property) Lender's Loss Payee (in the case of property insurance including rent loss or business interruption insurance) and an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance) a Non–Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the Person to which all payments made by such insurance company shall be paid; (iv) contain provisions permitting Borrower to waive its right of subrogation against Lender; (v) be assigned and the originals thereof delivered to Lender; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co–insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of cancellation of any of the Property Policies, and, when available, liability policies (provided, however, that if such notice provisions are not available in any of the liability Policies, Borrower shall provide the required notice to Lender), (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured, and (D) providing that Lender is permitted to make payments to effect the continuation of such Policy upon notice of cancellation due to non–payment of premiums; (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.  Borrower shall pay the premiums for such Policies (the "*Insurance Premiums*") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 3.3) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Borrower shall deliver to Lender a certified copy of each Policy within thirty (30) days after its effective date.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices and the like.

46

(b)     Notwithstanding the foregoing, the insurance policy or policies maintained by the Condominium Association, if any, shall be written in the name of, and the proceeds thereof shall be payable to, the members of the Board, as trustees for each of the owners of the units in the percentages established in the Condominium Documents, and to the respective mortgagees of the owners of the units, as their interests may appear.  The Board's liability policies shall name Borrower and Lender as additional insured.  At Lender's sole and absolute discretion, said policy or policies may also provide coverage for the Property including but not limited to the units comprising the Property and the attached, built-in, or installed fixtures and equipment to the full insurable replacement value thereof, with a separate mortgagee/lender's loss payable endorsement in favor of mortgagees of each unit.  Such policy or policies shall permit the waiver of subrogation and shall provide that the insurance company or companies will not look to the Board, or any owner of the units for the recovery of any loss under said policy or policies.  Such policy or policies shall not be cancelable except after 30 days written notice to Lender.  The original or a duplicate of such policy or policies shall be deposited with Lender with evidence of the payment of premiums and with renewal policies to be deposited with Lender not later than 30 days (10 days for nonpayment) prior to the expiration of existing policies. To the extent that the Board maintains coverage on the Property which provides insurance coverage in the amounts, for the periods, by companies and against the hazards described in this Section 7.1 or if such coverage is otherwise satisfactory to Lender, then Borrower's obligation under this Section to maintain insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Board's policies.  In the event that the policy or policies of insurance maintained by the Board does not include the Property, then Borrower shall furnish to Lender an original policy of insurance meeting the requirements of this Section 7.1.  If the Board ever fails to maintain terrorism insurance for the building shell, Borrower shall be obligated to obtain and maintain terrorism insurance on a standalone basis for the full value of the building shell. Anything hereinabove to the contrary notwithstanding, in the event the Board, or Borrower, fail or refuse to provide insurance coverage as above provided, Lender at its election may obtain such insurance for its benefit as mortgagee and may add the premium therefor to the unpaid balance of the Debt.  Further, the coverage maintained by the Board providing coverage for the Property (as such capitalized term is defined in the Condominium Declaration) must comply with the requirements herein or must otherwise be acceptable to the Lender.  If at any time, the coverage maintained by the Board providing coverage for the Property (as such capitalized term is defined in the Condominium Declaration) does not comply with the requirements herein or is not otherwise acceptable to the Lender, Borrower shall be obligated, if required by Lender, to provide or cause the Board to provide coverage, to the extent commercially available, that satisfies the requirements herein or is otherwise acceptable to Lender but Borrower shall not be obligated to violate the Condominium Documents in order to comply with the requirements of this sentence.

### 7.2     **Casualty**.

**7.2.1     Notice; Restoration.**  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "***Casualty***"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

47

**7.2.2**   **Settlement of Proceeds.**  If a Casualty covered by any of the Policies (an "***Insured Casualty***") occurs where the loss does not exceed $250,000, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "***Proceeds***").  In the event of an Insured Casualty where the loss equals or exceeds $250,000 (a "***Significant Casualty***"), Lender may, in its sole discretion, settle and adjust any claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss.  All Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney–in–fact, coupled with an interest, to endorse such check payable to the order of Lender.  The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.

**7.3**   **Condemnation**.

**7.3.1**   **Notice; Restoration.**  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "***Condemnation***") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation.   Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall (in conjunction with the Condominium Association) promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation (in accordance with the applicable provisions of the Condominium Declaration and the Condominium Act).

**7.3.2**   **Collection of Award.**   Lender is hereby irrevocably appointed as Borrower's attorney–in–fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "***Award***") and to make any compromise, adjustment or settlement in connection with such Condemnation.  Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note (or Undefeased Note, as the case may be).  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.

Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

**7.4** **Application of Proceeds or Award**.

**7.4.1** **Application to Restoration.** If an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than fifteen percent (15%) of the unpaid Principal, (ii) in the reasonable judgment of Lender, the Property can be restored within the earliest to occur of (x) six (6) months from the date of the Insured Casualty or Condemnation, (y) six (6) months before the Stated Maturity Date and (z) the expiration of the rental or business interruption insurance with respect thereto, to the Property's pre–existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt and (iii) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property (the "*Restoration*"), in the manner set forth herein. Borrower shall commence and diligently prosecute such Restoration. Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award to be made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents will be at least equal to the sum of the operating expenses and Debt Service, as reasonably determined by Lender.

**7.4.2** **Application to Debt.** Except as provided in Section 7.4.1, any Proceeds or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in Section 7.4.3. Any such prepayment of the Loan shall be without any Yield Maintenance Premium, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal. After any such application to the unpaid Principal, the remaining unpaid Principal shall be reamortized over the remaining Term hereof. In the event that (1) Lender does not make the Proceeds or Award available to the cost of Restoration and exercises its rights under this Section 7.4.2 to apply the Proceeds or Award to the payment of the Debt and (2) such application does not repay the Debt in full, Borrower shall have the right to prepay in full (but not in part) the remaining balance of the Debt within one hundred twenty (120) days after written notice of such application by Lender (provided that Borrower must in all events continue to pay all amounts due under the Loan Documents, including without limitation Debt Service, through the date of such prepayment), and any such prepayment of the Loan by Borrower shall be without payment of the Yield Maintenance Premium, unless an Event of Default has occurred and is continuing at

49

the time of such prepayment by Borrower, in which event Borrower shall pay to Lender the Yield Maintenance Premium with respect to the amount of such prepayment by Borrower.  In the event Borrower makes a prepayment pursuant to the immediately preceding sentence, (i) such prepayment must be made on a Business Day and (ii) if the date of such prepayment is not a Payment Date, then Borrower shall pay to Lender, in addition to all other sums payable to Lender in connection with such prepayment, a payment of interest, calculated at the Interest Rate, on the amount prepaid, through and including the next succeeding Payment Date.

       **7.4.3**   <u>**Procedure for Application to Restoration.**</u>  If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications and construction contracts for such Restoration, such plans and specifications and construction contracts to be approved by Lender prior to commencement of any work.  Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement.  No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien.  Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower.  Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt or returned to Borrower.  Lender's consent under this Section 7.4.3, if required, shall not be unreasonably withheld or delayed.

       **7.4.4**   <u>**Prepayment upon Partial Condemnation.**</u>  Notwithstanding the foregoing provisions in this <u>Section 7</u>, if the Loan or any portion thereof is included in a REMIC Trust and immediately following a release of any portion of the Lien of the Security Instrument in connection with a Condemnation (but taking into account any proposed Restoration of the remaining portion of the Property that remains subject to the Lien), the Loan-to-Value ratio of the remaining portion of the Property that remains subject to the Lien is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any), then the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Condemnation Award, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the

50

Loan-to-Value ratio (as so determined by Lender) does not increase after the release unless Lender receives an opinion of counsel that if such amount is not paid, the securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.

## 8.   **DEFAULTS**

**8.1   Events of Default.**  An "***Event of Default***" shall exist with respect to the Loan if any of the following shall occur:

(a)   any portion of the Debt is not paid when due or any other amount under Article 3 is not paid in full when due (unless sufficient funds are available in the relevant Subaccount on the applicable date);

(b)   any of the Taxes are not paid when due (unless Lender is paying such Taxes pursuant to Section 3.3), subject to Borrower's right to contest Taxes in accordance with Section 5.2;

(c)   if the Policies are not (A) delivered to Lender within five (5) Business Days of Lender's written request and (B) kept in full force and effect, each in accordance with the terms and conditions hereof;

(d)   a Transfer other than a Permitted Transfer occurs;

(e)   any representation or warranty made in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made;

(f)   Borrower shall (i) make an assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(g)   a receiver, liquidator or trustee shall be appointed for Borrower, or Borrower shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, as the case may be, only upon the same not being discharged, stayed or dismissed within ninety (90) days;

(h)   any covenant contained in Sections 5.11.1 (a) – (e), 5.12, 5.14, 5.15 or 5.16 is breached;

(i)   except as expressly permitted under this Agreement or any of the other Loan Documents, the actual alteration, improvement, demolition or removal of all or any material portion of the Improvements by Borrower without the prior written consent of Lender or the physical waste of any portion of the Property caused or permitted by Borrower;

51

(j)     an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

(k)     a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l)     any of the assumptions contained in any substantive non–consolidation opinion, delivered to Lender by Borrower's counsel in connection with the Loan or otherwise hereunder, were not true and correct as of the date of such opinion or thereafter became untrue or incorrect;

(m)     a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) days after notice to Borrower from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non–monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)–day period, and Borrower shall have commenced to cure such default within such thirty (30)–day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)–day period shall be extended for an additional period of time as is reasonably necessary for Borrower in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days;

(n)     Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in Article 9; or

(o)     If Borrower shall fail to pay any Common Charges when due or shall fail to perform any of its obligations, beyond any applicable notice and cure periods, with respect to the Board, the Condominium or the Condominium Documents as set forth herein or if for any reason the Property subject to the Condominium Documents is withdrawn from condominium ownership; or if by reason of damage or destruction of all or any portion of the Improvements which are part of the Condominium the Condominium Association does not duly and promptly proceed with the repair or restoration of such Improvements; or if by reason of the failure of Borrower to perform any act, as for example notification to the Board under the Condominium Documents, Lender shall not be entitled to the protective provisions under the Condominium Documents.

### 8.2     Remedies.

8.2.1     Acceleration.  Upon the occurrence of an Event of Default (other than an Event of Default described in subsection (f) or (g) of Section 8.1) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the

Property; including declaring the Debt to be immediately due and payable (including unpaid interest), Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in subsection (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

      **8.2.2** **Remedies Cumulative.** Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instrument has been foreclosed, the Property has been sold or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full. To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

      **8.2.3** **Severance.** Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall reasonably request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

      **8.2.4** **Delay.** No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but

any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

        **8.2.5**   **Lender's Right to Perform.**   If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan Documents) and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

## 9.   **SECONDARY MARKET PROVISIONS**

### 9.1   **Transfer of Loan**.

        (a)   Lender may, at any time, sell, transfer or assign the Loan, the Loan Documents and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass–through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "*Securities*") secured by or evidencing ownership interests in the Note and the Security Instrument (each such sale, assignment, participation or securitization, a "*Secondary Market Transaction*").  Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any NRSRO (all of the foregoing entities collectively referred to as the "*Investor*") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Borrower, and the Property, whether furnished by Borrower, or otherwise, as Lender determines necessary or appropriate.

        (b)   If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies or applicable Legal Requirements in connection with any Secondary Market Transactions, including to:

        (i)   (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, any Affiliate of Borrower, or Manager, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each Tenant) relating to the Property, and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due

54

diligence investigations of the Property (the information referred to in clauses (A), (B) and (C) shall hereinafter be referred to collectively as "*Updated Information*"), together, if customary, with appropriate verification of the Updated Information through letters of auditors, certificates of third party service providers or opinions of counsel acceptable to Lender and the Rating Agencies;

        (ii)    provide opinions of counsel, which may be relied upon by Lender and the NRSROs, and their respective counsel, agents and representatives, as to bankruptcy non-consolidation, fraudulent conveyance and true sale, or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, Borrower, and any Affiliate of Borrower, which counsel and opinions shall be reasonably satisfactory to Lender and the Rating Agencies;

        (iii)    provide updated (as of the closing date of any Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as Lender or the Rating Agencies may require;

        (iv)    subject to Section 9.4 hereof, execute modifications and amendments to the Loan Documents and Borrower's organizational documents as Lender or the Rating Agencies may reasonably require, including, without limitation, the addition of one or more Independent Directors pursuant to the terms and provisions of **Schedule 3** attached hereto III attached hereto; provided, however, that no amendment to the Loan Documents shall materially increase Borrower's obligations or materially decrease Borrower's rights on the Loan Documents as in effect immediately prior to such amendment;

        (v)    provide access to, and conduct tours of, the Property; and

        (vi)    provide certifications or other evidence of reliance acceptable to Lender and the Rating Agencies with respect to third party reports and other information obtained in connection with the origination of the Loan or any Updated Information.

    (c)    If requested by Lender, Borrower shall provide Lender, promptly upon request, with any financial statements, financial, statistical or operating information or other information as Lender shall reasonably determine is necessary or appropriate (including items required (or items that would be required if the Securities issued in connection with a Secondary Market Transaction were offered publicly) to satisfy any and all disclosure requirements pursuant to the Securities Act (including, but not limited to, Regulation AB), the Exchange Act, any other applicable securities laws or any amendment, modification or replacement to any of the foregoing) or required by any other Legal Requirements, in each case, in connection with any Disclosure Document (as hereinafter defined) or any filings pursuant to the Exchange Act in connection with or relating to the Secondary Market Transaction (an "*Exchange Act Filing*") or as may otherwise be reasonably requested by Lender.

    **9.2**    **Use of Information.**  Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with the Secondary Market Transaction, including an

offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "***Disclosure Document***") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "***Securities Act***"), or the Securities and Exchange Act of 1934, as amended (the "***Exchange Act***"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to the Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer (as hereinafter defined) or the placement agent or underwriter of the Secondary Market Transaction may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

   **9.3     Borrower Indemnity**.

       (a)     Borrower hereby agrees to indemnify Natixis, including its officers, directors, Affiliates and each Person who controls Natixis within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "***Natixis Group***"), the issuer of the Securities (the "***Issuer***" and for purposes of this <u>Section 9.3</u>, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Secondary Market Transaction, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "***Underwriter Group***") for any losses, claims, damages or liabilities (collectively, the "***Liabilities***") to which Natixis, the Natixis Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (i) any untrue statement of any material fact contained in the information provided to Natixis by Borrower and its agents, counsel and representatives, (ii) the omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (iii) a breach of the representations and warranties made by Borrower in <u>Section 4.8</u> of this Agreement (Full and Accurate Disclosure).  Borrower also agrees to reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities or (iv) the Condominium Documents.  Borrower's liability under this paragraph will be limited to Liabilities that arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Natixis by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

       (b)     In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Natixis, the Natixis Group, the Issuer and the Underwriter Group for Liabilities to which Natixis, the Natixis Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities

56

arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Natixis by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(c)      Promptly after receipt by an indemnified party under this Section 9.3 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.3, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel reasonably satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 9.3, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party.  Without the prior written consent of Natixis (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Natixis reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(d)      In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.3(a) or (b) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.3(a) or (b), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as

57

a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Natixis and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(e)     The liabilities and obligations of both Borrower and Natixis under this Section 9.3 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**9.4     Restructuring of Loan.**  Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time and from time-to-time (whether prior to or after any sale, participation or Securitization of all or any portion of the Loan), to require Borrower to (A) execute and deliver "component" notes and/or modify the Loan in order to create one or more senior and subordinate notes (i.e., an A/B or A/B/C, etc. structure) and/or one or more additional components (including pari-passu components) of the Note or Notes, reduce the number of components of the Note or Notes, revise the interest rate for each component, reallocate the principal balances of the Notes and/or the components, increase or decrease the monthly debt service payments for each component and/or such Notes or eliminate the component structure and/or the multiple note structure of the Loan (including the elimination of the related allocations of principal and interest payments) and provide for the repayment of each of the Notes and/or components in such order of priority as may be designated by Lender, and/or (B) restructure a portion of the Loan into one or more mezzanine loans (each, a "***New Mezzanine Loan***") to the owners of the direct and/or indirect equity interests in Borrower, secured by a pledge of such equity interests, establish different interest rates and debt service payments for the Loan and each New Mezzanine Loan and provide for the repayment of the Loan and each New Mezzanine Loan in such order of priority as may be designated by Lender, and/or consolidate one or more (including all) of such New Mezzanine Loans into the Loan and eliminate any such New Mezzanine Loan structure; provided, that (i) the total amounts of the Loan and the New Mezzanine Loan shall equal the amount of the Loan immediately prior to the restructuring, (ii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan or any voluntary or involuntary prepayment of all or any portion of the Loan and/or any New Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or any New Mezzanine Loan(s) in connection with a casualty or condemnation), the weighted average interest rate of the Loan and the New Mezzanine Loan, if any, shall, in the aggregate, equal the interest rate which was applicable to the Loan immediately prior to the restructuring and (iii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan or any voluntary or involuntary prepayment of all or any portion of the Loan and/or any New Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or any New Mezzanine Loan(s) in connection with a casualty or condemnation) the debt service payments on the Loan and the New Mezzanine Loan shall equal the debt service payment which was due under the Loan immediately prior to the

restructuring; provided that any such restructuring carried out after the closing of the Loan shall be at Borrower's cost.  Borrower shall cooperate with all reasonable requests of Lender in order to restructure the Loan and create the New Mezzanine Loan and shall (A) execute and deliver such documents including, in the case of the New Mezzanine Loan, a mezzanine note, a mezzanine loan agreement, a pledge and security agreement and a mezzanine deposit account agreement, (B) cause Borrower's counsel to deliver such legal opinions and (C) create such newly formed bankruptcy remote borrower under the New Mezzanine Loan as, in the case of each of (A), (B) and (C) above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and satisfactory to any such Rating Agency, including the severance of this Agreement, the Security Instrument and other Loan Documents if requested.  In the event Borrower fails to execute and deliver such documents to Lender within ten (10) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof.  It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9 after the expiration of ten (10) Business Days after notice thereof.  Borrower covenants and agrees that any such reallocation (as described above) will be in compliance with the representations and warranties set forth in Section 4.1 and Section 5.12 hereof.

## 10.     **MISCELLANEOUS**

**10.1     Exculpation.**  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this Section 10.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Security Instrument or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the

59

following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(a)     fraud or intentional misrepresentation by Borrower or any guarantor in connection with the Loan;

(b)     the gross negligence or willful misconduct of Borrower;

(c)     the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Sections 4.19 and 5.7, and clauses (viii) through (xi) of Section 5.18;

(d)     physical waste or after an Event of Default, the removal or disposal of any portion of the Property;

(e)     the misapplication or conversion by Borrower of (x) any Proceeds paid by reason of any Insured Casualty, (y) any Award received in connection with a Condemnation, or (z) any Rents, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents);

(f)     failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof;

(g)     any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Security Instrument or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(h)     an act or omission of Borrower, which hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower, of defenses or counterclaims;

(i)     Borrower's indemnifications of Lender set forth in Section 9.3;

(j)     the failure of Borrower to pay (or cause to be paid) Common Charges and/or Other Charges, the failure Borrower to comply with the requirements of Article XI hereof or a breach of any representation set forth in Section 4.24 hereof;

(i)     if Borrower, breaches any representation, warranty or covenant contained in Section 5.23, including without limitation, arising out of, or by reason of, the Violations, including, without limitation, the completion of the Work and the removal of the Violations (including, without limitation, the payment of any fines, charges or penalties required to remove same) or Borrower's failure to timely complete same or by reason of any investigation, litigation or other proceedings by any governmental agency relating to the Violations and all reasonable

fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceedings; and/or

(ii)     The existence of any Violations.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "*Springing Recourse Event*"):

(a)     an Event of Default described in Section 8.1(d) shall have occurred;

(b)     a breach of the covenant set forth in Section 5.12; or

(c)     the occurrence of any condition or event described in either (y) Section 8.1(f) unless, with respect to the occurrence of the event described in clause (ii) of Section 8.1(f), Borrower is unable to pay its debts generally as they become due, or (z) Section 8.1(g) and, with respect to such condition or event described in Section 8.1(g), either Borrower, or any Person owning an interest (directly or indirectly) in Borrower, causes such event or condition to occur (by way of example, but not limitation, such Person seeks the appointment of a receiver or files a bankruptcy petition), consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event or fails to contest such condition or event.

**10.2     Brokers and Financial Advisors.**  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders who will not be paid from the proceeds of the Loan at closing.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.  Borrower acknowledges and agrees that Lender and any of Lender's agents or correspondents, reserve the right, in their sole and absolute discretion, to provide additional compensation to any broker, correspondent or originator of the Loan.

**10.3     Retention of Servicer.**  Lender reserves the right to retain the Servicer and any special servicer to act as its agent(s) hereunder with such powers as are specifically delegated to the Servicer and any special servicer by Lender, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction, or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any customary fees and expenses of the Servicer and any reasonable third-party fees and expenses, including, without limitation, special servicing fees,

work-out fees, liquidation fees and attorney's fees and disbursements and fees and expenses in connection with a prepayment, release of the Property, approvals under the Loan Documents requested by Borrower, assumption of Borrower's obligations or modification of the Loan, special servicing or work-out of the Loan or enforcement of the Loan Documents. Notwithstanding the foregoing or anything contained herein to the contrary, Borrower shall not be responsible for any set up fees or any other initial costs relating to or arising under any pooling and servicing agreement or similar agreement, and Borrower shall not be responsible for payment of the regular monthly master servicing fee or trustee fee due to Servicer under the pooling and servicing agreement or similar agreement.

**10.4   Survival.**   This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**10.5   Lender's Discretion.**   Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**10.6   Governing Law.**

(a)   THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND THE ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS

AmericasActive:8841688.17

AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5–1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT STEVE OSMAN AT C/O METROPOLITAN PACIFIC PROPERTIES, INC., 21-77 33RD STREET, ASTORIA, NEW YORK, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS IN ACCORDANCE WITH THE C.P.L.R. AND WRITTEN NOTICE OF SAID SERVICE OF BORROWER MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK STATE (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK STATE OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**10.7**   **Modification, Waiver in Writing.**  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

AmericasActive:8841688.17

**10.8    Trial by Jury.**   BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 10.8 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9    Headings/Exhibits.**  The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Exhibits attached hereto, are hereby incorporated by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**10.10    Severability.**   Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11    Preferences.**   Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply (or having so applied, to reverse and reapply) any and all payments by Borrower to any portion of the Debt. To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12    Waiver of Notice.**   Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**10.13    Remedies of Borrower.**  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents,

including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

     **10.14**  **Prior Agreements.**  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

     **10.15**  **Offsets, Counterclaims and Defenses.**  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

     **10.16**  **Publicity.**  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender.  Lender shall have the right to issue any of the foregoing and use the same in its marketing efforts without Borrower's approval, and Borrower hereby consents thereto and to Lender's use of Borrower's name, the name and address of the Property, the amount of the Loan, and such other information, including but not limited to the reproduction, publication and distribution of photographs and other images, regarding the Property as were obtained or developed by or on behalf of Lender, or as were obtained, developed or provided by or on behalf of Borrower, its Affiliates, agents, counsel, representatives or brokers, including as may be available on any website or data site established or maintained by Borrower, its Affiliates, agents, representatives or brokers regarding the Property.  Borrower represents and warrants to Lender that Borrower has sufficient rights in such information, including but not limited to such photographs and other images, to grant Lender and its Affiliates the above rights to use such information, and agrees to hold Lender and its Affiliates harmless from any claim resulting from the failure or alleged failure to maintain such rights.  Furthermore, Borrower agrees to cooperate with Lender in a reasonable manner in connection with the use of such other information as may be reasonably requested by Lender.

     **10.17**  **No Usury.**  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this <u>Section 10.17</u> shall control every other agreement in the Loan Documents.  If the applicable

65

law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18   Conflict; Construction of Documents.**  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

**10.19   No Third Party Beneficiaries.**  The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20   Yield Maintenance Premium.**  Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents that is not prepayable prior to the Open Prepayment Date and (b) if payments of Principal are made to Lender prior to the regularly scheduled due date for such payment, for any reason whatsoever, including as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower expressly waives any right or privilege to prepay the Loan except as otherwise may be specifically permitted herein and agrees that, except as expressly provided in Sections 2.3.4 and 7.4.2, all prepayments, if any, will be accompanied by the Yield Maintenance Premium.  Such Yield Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate

AmericasActive:8841688.17

and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**10.21   Assignment.**   The Loan, the Note, the Loan Documents or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise.  Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender.  Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**10.22   Counterparts.**   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

## 11.   CONDOMINIUM PROVISIONS

### 11.1   Condominium Provisions.

#### 11.1.1   Borrower shall:

(a)   cause to be done all things necessary to operate and maintain the Property as a condominium; provided, however, that Borrower will not record or file (and will not cause to be recorded or filed) any modifications or amendments to the Condominium Documents in the appropriate land records without Lender's prior written consent and Borrower shall comply with all Legal Requirements of any Governmental Authorities, including securities laws and regulations, which may apply to the formation and operation of the Condominium or to the sale of units and furnish such evidence of compliance therewith as Lender may reasonably request;

(b)   not transfer the portion of the Property which is a part of the Condominium or any part thereof and not make any assignment or grant any security interest in the Condominium Declaration or in its rights, benefits or privileges thereunder to anyone other than Lender without the prior written consent of Lender;

(c)   not, and shall instruct its designees on the Board that they shall not, vote to amend, modify or supplement or terminate or consent to any amendment, modification or supplement or termination of the Condominium Declaration for the Condominium, the by-laws of the Condominium Association or any other Condominium Documents without the prior written consent of Lender, except to correct errors that are clearly clerical in nature nor shall Borrower waive or consent to the waiver of any enforcement of the provisions of any of the foregoing Condominium Documents with respect to any other owner of a condominium unit, if

AmericasActive:8841688.17

any, that is subject to the Condominium Declaration if such waiver, consent or waiver of enforcement is reasonably likely to adversely affect Lender's rights or remedies hereunder;

(d)     timely pay any and all Common Charges and expenses made against the portion of the Property then owned by Borrower pursuant to the Condominium Documents within ten (10) Business Days after the same shall become due and payable but in all respects before the same become delinquent.  In the event that Borrower fails to make such payments as the same become due and payable, Lender may from time to time at its option, but without any obligation to do so, make any such payments, and the same shall be added to the Debt secured by the Loan Documents, and shall bear interest until repaid at the Default Rate;

(e)     comply (and cause compliance by the Condominium Association to the extent controlled by Borrower) in all respects with all of the terms, covenants and conditions on Borrower's part (and the Condominium Association's part to the extent controlled by Borrower) to be complied with pursuant to the Condominium Declaration for the Condominium, the by laws of the Condominium Association, any rules and regulations that may be adopted for the Condominium, any other Condominium Documents, the Condominium Act and all rules and regulations promulgated thereunder by any Governmental Authority, and all other applicable Legal Requirements, as the same may apply to the Property or the Condominium Association (to the extent Controlled by Borrower) or to Borrower from time to time as the same shall be in force and effect from time to time;

(f)     take all actions as may be necessary from time to time to preserve and maintain the Property in accordance with the securities and condominium laws of the State of New York and the rules and regulations pertaining thereto;

(g)     not, without the prior written consent of Lender, take (and Borrower hereby assigns to Lender any right it may have to take) any action to abandon or terminate the Condominium, withdraw the Property from the Condominium Act and the rules and regulations pertaining thereto, or subdivide or cause a partition of the Property;

(h)     not, without the prior written consent of Lender, exercise any right it may have to vote for (i) the expenditure of Insurance Proceeds or a condemnation award for the Restoration of the Property, (ii) any material alterations to the common elements of the Condominium, or (iii) any borrowing on behalf of the Condominium Association;

(i)     seek Lender's review and obtain Lender's prior written approval of any vote of Borrower in its capacity as a unit owner of a condominium unit that is subject to the Condominium Declaration, or any vote of its designees on the Board, to any engagement of or change of managing agent and any amendment to the management agreement for the operation of the Condominium or any units comprising the Property, as well as the original and any revision of any operating and/or capital budgets (provided that any manager of the Property approved by Lender shall be deemed to be approved for this purpose);

(j)     promptly deliver to Lender a true and full copy of each and every written notice of default or notice requiring the performance of any act by Borrower received by

Borrower with respect to any obligation of Borrower under the provisions of the Condominium Documents;

(k) provide Lender such information and documentation relating to the Condominium as Lender shall reasonably request;

(l) shall maintain control of the Condominium Association for as long as it is permitted to do so under applicable Legal Requirements and shall not, without Lender's prior written approval, transfer Control of the Condominium Association to any party prior to the time Borrower is required to do so by the Condominium Act; and

(m) shall deliver or cause to be delivered to Lender true, correct and complete copies of any modifications or amendments to the Condominium Documents entered into after the date hereof.

**11.2** **Noncompliance.** In the event of the failure of Borrower to perform any of its obligations relating to the Property under the Condominium Documents within a period of ten (10) Business Days (unless the Board requires sooner performance) after notice from the Board or from Lender, or in the case of any such default which cannot with due diligence be cured or remedied within such period, if Borrower fails to proceed promptly after such notice to cure or remedy the same with due diligence, then in any such case, Lender may from time to time at its option, but without any obligation so to do, cure or remedy any such default of Borrower (Borrower hereby authorizing Lender to enter upon the Property as may be necessary for such purposes), and all sums expended by Lender for such purposes, including reasonable counsel fees, shall be added to the Debt secured by the Loan Documents, shall become due and payable and shall bear interest until repaid at the Default Rate and shall be added to the Debt; provided, however, that the failure of Borrower to keep or perform any such notice, or, in the case in which such cannot be kept or performed within such ten (10) Business Day period, provided Borrower has commenced to cure such default and is diligently pursuing same to completion, such additional time as is needed to so complete, shall, at the election of Lender, constitute an Event of Default.

**11.3** **Event of Default.** Subject to all Legal Requirements, from and after the occurrence and during the continuance of an Event of Default, Lender shall have the right to require that any members (or representatives) of the Board or any other condominium or owners association created under the Condominium Documents and any officers thereof, that are in each case elected (or appointed) by Borrower to tender their written resignation and Lender shall have the right to replace such member or representative with a person elected or appointed by Lender. Lender has required that, with respect to all of the current members of the Board appointed by Borrower and all officers of the Condominium Association who are Affiliates, employees or agent of Borrower tender written resignations from each of them as of the date hereof. Lender may submit such written resignations to the Condominium at the Condominium's address at any time after the occurrence of an Event of Default, whereupon said resignations shall be valid and afforded full recognition and effect. Further, Borrower shall cooperate with Lender in all respects to replace said managers and officers affiliated with Borrower with managers and officers of Lender's choosing. In addition, from and after the occurrence and during the continuance of an Event of Default, Lender shall have the right to exercise all of the rights and

69

privileges provided to Lender by this Agreement and the other Loan Documents with respect to an Event of Default including, without limiting the generality of the foregoing, the right to exercise all voting rights accruing to an owner of a condominium unit that is subject to the Condominium Declaration and all other rights accruing to an owner of a condominium unit that is subject to the Condominium Declaration.   While any such Event of Default continues, Borrower hereby nominates and appoints Lender irrevocably as Borrower's proxy and attorney in fact to vote and, as Borrower's agent, to act with respect to all such rights.  Written notice of any such Event of Default from Lender to the Board shall be deemed conclusive as to such right of Lender to vote and to exercise all such rights.

**11.4**   **Failure to Pay Amounts Due.**   If the Borrower  fails to pay any amounts due under the Condominium Declaration or By-Laws (as defined in the Condominium Declaration), or is otherwise in default Condominium Declaration or By-Laws, or upon the occurrence of an Event of Default, then Lender shall be entitled to vote in lieu of the Borrower on all matters or actions to be decided upon by the Unit Owners (as defined in the Condominium Declaration) (as if the Lender were the Borrower), (ii) the Lender shall be entitled to immediately name substitute Managers (as defined in the Condominium Declaration) to act on the Board (in lieu of any Managers elected by the Borrower and without regard to the unexpired term of such Manager's tenure) and (iii) the Board shall rely (and be entitled to rely) on the votes of or actions taken by the Lender (or by any Manager elected by the Lender) in determining the appropriateness of any action to be taken.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**ACROPOLIS GARDENS REALTY CORP.,**
a New York corporation

By: _____
    Name: Debbie Vazquez
    Title:  President

**LENDER:**

**NATIXIS REAL ESTATE CAPITAL LLC,**
a Delaware limited liability company

By: _____
    Name: Christopher Colon
    Title:  Vice President

By: _____
    Name: Michael Magner
    Title:  Managing Director

*[Natixis: Acropolis Gardens – Loan Agreement – Signature Page]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**ACROPOLIS GARDENS REALTY CORP.,**
a New York corporation

By: _____
      Name: Debbie Vazquez
      Title:  President

**LENDER:**

**NATIXIS REAL ESTATE CAPITAL LLC,**
a Delaware limited liability company

By: _____
      Name: Christopher Colon
      Title:  Vice President

By: _____
      Name: Michael Magner
      Title:  Managing Director

*[Natixis: Acropolis Gardens – Loan Agreement – Signature Page]*

**Schedule 1**

**Index of Other Definitions**

*"ACM"  -5.25*
*"ACM Maintenance Program"* -5.25
"*Act*" – Schedule 4
"*Annual Budget*" – 6.3.5
"*Applicable Taxes*" – 2.2.3
"*Award*" – 7.3.2
"*Bankruptcy Action*" – Schedule 4
"*Bankruptcy Code*" – Security Instrument
"*Bankruptcy Proceeding*" – 4.7
"*Borrower's Recourse Liabilities*" – 10.1
"*Buyer*" – 5.16
"*Capital Budget*" – 6.3.5
"*Capital Reserve Subaccount*" – 3.4
"*Cash Collateral Reserve Subaccount*" – 3.11
"*Cash Management Accounts*" – 3.9
"*Casualty*" – 7.2.1
"*Casualty/Condemnation Prepayment*" – 2.3.2
"*Casualty/Condemnation Subaccount*" – 3.7
"*Condemnation*" – 7.3.1
"*Defeasance*" – 2.3.3(a)
"*Defeasance Date*" – 2.3.3(a)(i)
"*Defeasance Deposit*" – 2.3.3(a)(iv)
"*Defeasance Notice*" – 2.3.3(a)(i)
"*Defeased Note*" – 2.3.3(a)(vi)
"*Disclosure Document*" – 9.2
"*Embargoed Person*" – 5.19(a)
"*Environmental Laws*" –  4.19
"*Equipment*" – Security Instrument
"*Exchange Act*" – 9.2
"*Exchange Act Filing*" – 9.1(c)
"*Event of Default*" – 8.1
"*FATF*" – 5.19(b)
"*First Payment Date*" – 2.2.1
"*Full Defeasance*" – 2.3.3(a)
"*Hazardous Substances*" – 4.19
"*Improvements*" – Security Instrument
"*Indemnified Liabilities*" – 5.18
"*Indemnified Party*" – 5.18
"*Independent Director*" – Schedule 4
"*Independent Manager*" – Schedule 4
"*Insurance Premiums*" – 7.1.2
"*Insured Casualty*" – 7.2.2
"*Issuer*" – 9.3(a)

"*Investor*" – 9.1
"*Late Payment Charge*" – 2.5.3
"*Lead-Based Paint Maintenance Program*" 5-24
"*Lender's Consultant*" – 5.7.1
"*Liabilities*" – 9.3(a)
"*Licenses*" – 4.10
"*Loan*" – 2.1
"*Monthly Debt Service Subaccount*" – 3.10(a)
"*Natixis Group*" – 9.3(a)
"*New Mezzanine Loan*" – 9.4
"*Notice*" – 6.1
"*OFAC*" – 5.19(a)
"*Operating Budget*" – 6.3.5
"*Operating Expense Subaccount*" – 3.6
"*Partial Defeasance*" – 2.3.3(a)
 "*Policies*" – 7.1.2
"*Principal*" – 2.1
"*Proceeds*" – 7.2.2
"*Proposed Material Lease*" – 5.9.2
"*Remedial Work*" – 5.7.2(c)
"*Rent Roll*" – 4.15
"*Required Records*" – 6.3.6
"*Required Repairs*" – 3.2.1
"*Required Repairs Subaccount*" – 3.2.2
"*Restoration*" – 7.4.1
"*Rollover Reserve Subaccount*" – 3.5
"*Scheduled Defeasance Payments*" – 2.3.3(a)
"*Secondary Market Transaction*" – 9.1
"*Securities*" – 9.1
"*Securities Act*" – 9.2
"*Security Agreement*" – 2.3.3(a)(vii)
 "*Significant Casualty*" – 7.2.2
"*Single Member Bankruptcy Remote LLC*" – Schedule 4
"*Sole Member*" – Schedule 4
"*Special Member*" – Schedule 4
"*Special Purpose Entity*" – Schedule 4
"*Special Transfer*" – 5.16
"*Springing Recourse Event*" – 10.1
"*Subaccounts*" – 3.9
"*Successor Borrower*" – 2.3.3(b)
"*Successor Guarantor*" – 5.16(i)
"*Tax and Insurance Subaccount*" – 3.3
"*Undefeased Note*" – 2.3.3(a)(vi)
"*Underwriter Group*" – 9.3(a)
"*Updated Information*" – 9.1(b)(i)
"*Violations*" 5.23

"*Work*" 5.22

## Schedule 2

## Required Repairs

| # | Description | | Used by Natixis |
|---|---|---|---|
| 1 | Partner was provided with several lists of violations that were identified for the subject property during a title search. A total of 158 DOB and ECB violations are listed in association with the subject property. 31 of the 158 are noted to represent an "Immediately Hazardous Condition". Based on a cursory review, it appears that there are multiple listings for the same violations, that there is overlap between the DOB and ECB violations, and that these violations are in the process of being addressed by Property Management in conjunction with an expeditor. Partner recommends Property Management continue to work with an expeditor to address and close out these open violations. Partner was also provided with two deposit agreements indicating that $162,000 and $45,358.39 has been held in escrow to address the open ECB violations including related penalty charges. Based on the $162,000 and $45,358.39 held in escrow to resolve these violations, no additional costs are included in the Tables of this report. | | $ - |
| 2 | The storm drainage system throughout the subject property was observed to be in fair to poor condition. Evidence of ponding and silt collection was observed throughout the site with silt and standing water observed: within the basement entry wells; within basements; within boiler rooms; and within the electric service areas. Boiler rooms are equipped with automatic sump pumps that according to the building superintendent are connected to each building's storm drainage system. It was apparent from the overflow of standing water in the pump pit that the sumppumps were no longer operational. The source of water infiltration into the boiler rooms may be a result of a broken site drain located in the ventilation well along planting beds adjacent to the boiler rooms. At some of the basement entry wells, ponding was so significant that 8" wooden pallets had been laid to provide access and overflow of water had fouled the basement. Other evidence of failed site drainage that was observed includes broken concrete around center courtyard drains and entire courtyards filled with (frozen) standing water. Broken concrete along drainage lines is frequently an indication that the storm line has sunk and/or has broken. Based on age of the property, and observed condition it is probable that the storm drainage system has exceeded it Estimated Useful Life (EUL). Replacement of the site storm drainage system is recommended. | | $ 40,000.00 |
| 3 | The exterior fire escapes were observed in poor condition. There is evidence of corrosion noted throughout. As noted above in the Executive Summary and Section 4.3.1 masonry cracking is observed where fire escapes seat into the exterior masonry walls. This is an indication that the connection bolts and anchors may be deteriorated. Due to the condition of the fire escapes and associated masonry cracking a budgetary cost repair of the fire escapes is recommended. In addition, upon completion of the repairs, scraping and repainting is recommended. | | $ 100,000.00 |
| 4 | The concrete within the center courtyards of the buildings was noted in fair to poor condition with heaved and broken sections of concrete observed. Repair of the noted areas is recommended. | | $ 31,250.00 |
| 5 | The basement entry stairs were observed in generally good to poor condition. At select cellar stairs the perimeter curbing along the stair wells has deteriorated along with the top coursing of the underlying stone rubble retaining wall. This was particularly prominent on the stairs leading to the basements of buildings # 3 and # 4. Metal pipe rails along the stairwell and stairwell walls were typically noted as rusted and too deteriorated to repair, requiring replacement. Utility stairs and ramps from the front sidewalks to the center courtyards were noted in poor condition, also requiring repair. Partner recommends that all broken and deteriorated sections of concrete at the center courtyards be replaced, missing sections of stone rubble at stairwell retaining walls be repaired and all new metal handrails and railing be installed. Additionally, all utility stairs and ramps are to be repaired. | | $ 20,000.00 |
| 6 | Concrete wells are provided in the landscaped areas. The wells are typically enclosed with a grate at grade level and provide fresh air for the boiler rooms. The ventilation shaft outside of building # 3 was noted to have collapsed and has created a potential fall hazard for pedestrians. Repair of the well and installation of a new grate is recommended | | $ 3,125.00 |
| 7 | The exterior brick masonry walls were observed to be in fair to poor condition with numerous locations that displayed loose or missing mortar, as well as vertical, horizontal and/or step cracks. Masonry cracks were also observed where fire escapes baskets seat into the parapet walls. It is recommended that an inspection of all building facades be performed in order to establish a precise scope of work and that recommended repairs and repointing, along with repairs to the fire escape masonry securements be performed. Partner has provided an allowance in the Immediates for commencement of this work. An opinion of cost for the remaining repair work has been allocated within the first few years of the Reserve Term. | | $ 125,000.00 |
| 8 | Though crawl spaces could not be adequately reviewed due to size and accessibility, Partner observed that a section of the front wall to the crawl space in building # 14 had been demolished to accommodate a steam return repair. As this wall is a foundation wall, Partner recommends that the wall be repaired to restore its structural integrity. | | $ 3,125.00 |
| | **Total Upfront Holdbacks** | | $ 322,500.00 |

## ALL REQUIRED REPAIRS TO BE COMPLETED WITHIN 180 DAYS OF THE DATE HEREOF

## **Schedule 3**

**Organization of Borrower**

Schedule 3 - 1



* NO INDIVIDUAL OR ENTITY WHEN CONSIDERED WITH THEIR AFFILATES OWNS MORE THAN 18% OF THE BORROWER OR HAS THE ABILITY TO CONTROL (AS DEFINED IN THE LOAN AGREEMENT)THE BORROWER.

## Schedule 4

### Definition of Special Purpose Entity

A "*Special Purpose Entity*" means either (1) a limited liability company that is a Single Member Bankruptcy Remote LLC (as hereinafter defined) or (2) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter:

      (i)     was and will be organized solely for the purpose of (A) owning the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

      (ii)     has not engaged and will not engage in any business unrelated to (A) the ownership of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

      (iii)     has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

      (iv)     has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

      (v)     if such entity is a limited partnership, has and will have, as its only general partner a Special Purpose Entity that is a corporation;

      (vi)     if such entity is a corporation, has and will have at least one Independent Director, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless all of the directors (including any Independent Directors) shall have participated in such vote;

      (vii)     if such entity is a limited liability company other than a single member limited liability company, has and will have as its only managing member a Special Purpose Entity that is a corporation;

      (viii)     if such entity is a limited liability company, has and will have articles of organization, a certificate of formation or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority–in–interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of a majority–in–interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Property without the consent of the applicable Rating Agencies

for as long as the Loan is outstanding;

(ix)     has not, and without the unanimous consent of all of its partners, directors or members (including any Independent Director or Independent Manager), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, take any Bankruptcy Action;

(x)     has maintained and will intend to maintain adequate capital in light of its contemplated business operations, provided, however, the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower;

(xi)     has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)     has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns separate from any other Person;

(xiii)     has maintained and will maintain its books, records, resolutions and agreements as official records separate from any other Person;

(xiv)     has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)     has held and will hold its assets in its own name;

(xvi)     has conducted and will conduct its business in its name only, and has not and will not use any trade name,

(xvii)     has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii) has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xix)     has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)     has maintained and will maintain an arm's–length relationship with its Affiliates;

(xxi)     (a)     if such entity owns the Property, has and will have no indebtedness other than the Permitted Indebtedness, or

(b)     if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred, or

(c)      if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred;

(xxii)  has not and will not assume or guarantee or become obligated for the debts or obligations of any other Person or hold out its credit or assets as being available to satisfy the debts or obligations of any other Person except for the Loan;

(xxiii)  has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)  has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks bearing its own name;

(xxv)   except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)  has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii) has not made and will not make loans to any Person;

(xxix)  has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)   has not entered into or been a party to, and will not enter into or be a party to, any transaction, contract or agreement with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's–length transaction with an unrelated third party;

(xxxi)  has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation; and

(xxxii) will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

"***Independent Director***" means in the case of a corporation, a natural person who, for the five (5) year period prior to his or her appointment as Independent Director has not been, and during the continuation of his or her service as Independent Director is not, directly or indirectly:

      (i)    an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the corporation or any of its Affiliates (other than his or her service as an Independent Director of the corporation),

      (ii)    a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the corporation or any of its shareholders or Affiliates (other than his or her service as an Independent Director if such Person has been provided by a nationally–recognized company that provides professional independent directors),

      (iii)    a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

      (iv)    any member of the immediate family (including a grandchild or sibling) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Director of the corporation because such person is an independent director of a "Special Purpose Entity" affiliated with the corporation that does not own a direct or indirect equity interest in the corporation or any entity that is a co–borrower with the corporation if such individual is an independent director provided by a nationally–recognized company that provides professional independent directors.

"***Independent Manager***" means in the case of a limited liability company, (a) a member that is a single purpose entity, (b) a single purpose entity  that is not a member or (c) a natural person who, for the five (5) year period prior to his or her appointment as Independent Manager is not, directly or indirectly:

      (i)    an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the limited liability company or any of its Affiliates (other than his or her service as an Independent Manager or Special Member of the limited liability company),

      (ii)    a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the limited liability company or any of its members or Affiliates (other than his or her service as an Independent Manager if such Person has been provided by a nationally–recognized company that provides professional independent managers),

      (iii)    a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

      (iv)    any member of the immediate family (including grandchildren or siblings) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Manager of the limited liability company because such person is an independent manager of a

"Special Purpose Entity" affiliated with the limited liability company that does not own a direct or indirect equity interest in the limited liability company or any entity that is a co–borrower with the limited liability company if such individual is an independent manager provided by a nationally–recognized company that provides professional independent managers.

"*Single Member Bankruptcy Remote LLC*" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter

(i)        complies with the following clauses of the definition of Special Purpose Entity above:  (i)(A), (ii)(A), (iii), (iv), (ix), (x), (xi) and (xiii) through (xxxii);

(ii)        has maintained and will maintain its accounts, books and records separate from any other person;

(iii)        has and will have an operating agreement which provides that the business and affairs of Borrower shall be managed by or under the direction of:

(A)        a board of one (1) or more managers designated by the sole member of the Single Member Bankruptcy Remote LLC (the "*Sole Member*"), and at all times there shall be at least one (1) duly appointed Independent Manager on the board of managers, and the board of managers will not take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of managers unless, at the time of such action there is at least one (1) member of the board of managers who is an Independent Manager, and all of the managers and the Independent Manager shall have participated in such vote; or

(B)        Sole Member, provided that at all times there shall be at least one (1) Independent Manager designated by Sole Member and the operating agreement provides that Sole Member shall not take any Bankruptcy Actions without the affirmative vote of the Independent Manager;

(iv)        has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)        upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), one of the Independent Managers shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "*Special Member*") and shall preserve and continue the existence of Borrower without dissolution;

(B)        no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its appointment as an Independent Manager; and

(C)     except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower;

(v)     has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)     Borrower shall be dissolved, and its affairs shall be would up only upon the first to occur of the following: (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "*Act*") or (y) the entry of a decree of judicial dissolution under Section 18–802 of the Act;

(B)     upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower;

(C)     the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution;

(D)     in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18–804 of the Act; and

(E)     to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

"*Bankruptcy Action*" means, with respect to any Person, if such Person:

(i)     makes an assignment for the benefit of creditors;

(ii)    files a voluntary petition in bankruptcy;

(iii)    is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings;

(iv)    consents to or files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any bankruptcy or insolvency proceeding;

(vi)    seeks, consents to or acquiesces in the appointment of a trustee, receiver, liquidator, sequestrator, custodian or any similar official of or for such Person or of all or any substantial part of its properties;

(vii)    one hundred twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed;

(viii)    within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated; or

(ix)    takes any action in furtherance of any of the foregoing.

SCHEDULE 5
VIOLATIONS

IMMEDIATE REMEDIATION REQUIRED

[Attached hereto]

SCH. III-1

|     | TYPE | VIOLATION NO. |
|-----|------|---------------|
| 1.  | Fire Dept. Violation | 10079975P |
| 2.  | Fire Dept. Violation | 11251951Z |
| 3.  | Fire Dept. Violation | 11251952K |
| 4.  | Fire Dept. Violation | 11259352N |
| 5.  | Fire Dept. Violation | 11259353P |
| 6.  | Fire Dept. Violation | 11259356K |
| 7.  | Fire Dept. Violation | 11259357M |
| 8.  | Fire Dept. Violation | 11259360N |
| 9.  | Fire Dept. Violation | 11260092Y |
| 10. | Fire Dept. Violation | 11422749Z |
| 11. | Fire Dept. Violation | 11467356R |

REMAINING VIOLATIONS

Any and all violations (including, without limitation, the payment of any fines, charges or penalties required to remove same) issued by either (x) the New York City Department of Buildings, (y) the New York City Department of Housing, and (z) New York City Environmental Control Board, presently existing, if any.

[See Attached Hereto]

SCH. III-2

## ACROPOLIS GARDENS – VIOLATIONS CHART
## MASTER LIST

| | TYPE | VIOLATION NO. |
|---|---|---|
| 1. | Fire Dept. Violation | 10079975P |
| 2. | Fire Dept. Violation | 11251951Z |
| 3. | Fire Dept. Violation | 11251952K |
| 4. | Fire Dept. Violation | 11259352N |
| 5. | Fire Dept. Violation | 11259353P |
| 6. | Fire Dept. Violation | 11259356K |
| 7. | Fire Dept. Violation | 11259357M |
| 8. | Fire Dept. Violation | 11259360N |
| 9. | Fire Dept. Violation | 11260092Y |
| 10. | Fire Dept. Violation | 11422749Z |
| 11. | Fire Dept. Violation | 11467356R |
| 12. | Emergency Repair Lien | Filed against 21-15 33rd Street |
| 13. | Highway Violations<br>Sidewalk Notice | Index No. 73179 filed 10/15/2015 |
| 14. | Oil Tank Permit | Filed against 21-15 33rd Street |
| 15. | Oil Tank Permit | Filed against 21-05 33rd Street |
| 16. | Oil Tank Permit | Filed against 21-27 33rd Street |
| 17. | Oil Tank Permit | Filed against 21-37 33rd Street |
| 18. | Oil Tank Permit | Filed against 21-47 33rd Street |
| 19. | Oil Tank Permit | Filed against 21-57 33rd Street |
| 20. | Oil Tank Permit | Filed against 21-67 33rd Street |
| 21. | Oil Tank Permit | Filed against 21-77 33rd Street |
| 22. | Oil Tank Permit | Filed against 21-06 35th Street |
| 22. | Oil Tank Permit | Filed against 21-16 35th  Street |
| 23. | Oil Tank Permit | Filed against 21-28 35th Street |
| 24. | Oil Tank Permit | Filed against 21-38 35th Street |
| 25. | Oil Tank Permit | Filed against 21-48 35th Street |
| 26. | Oil Tank Permit | Filed against 21-58 35th  Street |
| 27. | Oil Tank Permit | Filed against 21-68 35th Street |

| | | |
|---|---|---|
| 28. | Oil Tank Permit | Filed against 21-78 35th Street |
| 29. | ECB | 34710466J |
| 30. | ECB | 32072854P |
| 31. | ECB | 32074212M |
| 32. | ECB | 32074211K |
| 33. | ECB | 35096749Z |
| 34. | ECB | 35016293R |
| 35. | ECB | 35005373N |
| 36. | ECB | 34989478H |
| 37. | ECB | 32070046H |
| 38. | ECB | 32071434Y |
| 39. | ECB | 34939637K |
| 40. | ECB | 34944915H |
| 41. | ECB | 35054607H |
| 42. | ECB | 35095601H |
| 43. | ECB | 32073649K |
| 44. | ECB | 32075895P |
| 45. | ECB | 35036816P |
| 46. | ECB | 35116045X |
| 47. | ECB | 35152854Y |
| 48. | ECB | 35116046H |
| 49. | ECB | 34703643X |
| 50. | ECB | 35026649H |
| 51. | ECB | 35059336H |
| 52. | ECB | 35115982X |

| | | |
|---|---|---|
| 53. | ECB | 35115823Z |
| 54. | ECB | 35115784P |
| 55. | ECB | 35115852H |
| 56. | ECB | 32075077N |
| 57. | ECB | 32075078P |
| 58. | ECB | 32060429X |
| 59. | ECB | 34925594M |
| 60. | ECB | 00406530P |
| 61. | ECB | 00407717J |
| 62. | ECB | 35058642L |
| 63. | ECB | 35029792Y |
| 64. | ECB | 35022048Y |
| 65. | ECB | 35116043M |
| 66. | ECB | 35116044Y |
| 67. | ECB | 35036815N |
| 68. | ECB | 35116047J |
| 69. | ECB | 35116048L |
| 70. | ECB | 35115783N |
| 71. | ECB | 35115958X |
| 72. | ECB | 40718995Z |
| 73. | ECB | 44270686H |
| 74. | ECB | 44283305H |
| 75. | ECB | 43884379H |
| 76. | ECB | 40718994R |
| 77. | ECB | 41027072Y |

| 78. | ECB | 40967933K |
| 79. | ECB | 44270685X |
| 80. | ECB | 41209025Z |
| 81. | ECB | 44270684Y |
| 82. | ECB | 41185907R |
| 83. | DOB | 062893LL629108371 |
| 84. | DOB | 031903LL629125328 |
| 85. | DOB | 121416AEUHAZ100546 |
| 86. | ECB | 32079650P |
| 87. | DOB | 062893LL629108372 |
| 88. | DOB | 031903LL629125321 |
| 89. | DOB | 121416AEUHAZ100547 |
| 90. | ECB | 32079651R |
| 91. | DOB | 062893LL629108373 |
| 92. | DOB | 050498LL629128329 |
| 93. | DOB | 031903ll629125331 |
| 94. | DOB | 032407C0102IS |
| 95. | DOB | 121416AEUHAZ100548 |
| 96. | ECB | 32079652Z |
| 97. | ECB | 34443720M |
| 98. | DOB | 062893LL629108374 |
| 99. | DOB | 050498LL629128330 |
| 100. | DOB | 031903LL629125319 |
| 101. | ECB | 34512723Y |
| 102. | DOB | 121416AEUHAZ100553 |

| | | |
|---|---|---|
| 103. | ECB | 32079904X |
| 104. | DOB | 113016AEUHAZ100469 |
| 105. | ECB | 32076946K |
| 106. | DOB | 121416AEUHAZ100554 |
| 107. | DOB | 092315AEUHAZ100426 |
| 108. | ECB | 32079905H |
| 109. | ECB | 35212690Z |
| 110. | DOB | 121416AEUHAZ100549 |
| 111. | DOB | 092315AEUHAZ100423 |
| 112. | DOB | 072915AEUHAZ100372 |
| 113. | ECB | 32079653K |
| 114. | DOB | 121416AEUHAZ10052 |
| 115. | DOB | 081215AEUHAZ100325 |
| 116. | ECB | 32079906J |
| 117. | ECB | 35215063N |
| 118. | DOB | 062893LL629108396 |
| 119. | DOB | 050498LL629128348 |
| 120. | DOB | 031903LL629125320 |
| 121. | DOB | 050312 BENCH02622 |
| 122. | DOB | 090915AEUHAZ100259 |
| 123. | DOB | 121416AEUHAZ100550 |
| 124. | ECB | 32079654M |
| 125. | DOB | 062893LL629108367 |
| 127. | DOB | 031903LL629125318 |
| 128. | DOB | 060313 BENCH01084 |

| 129. | DOB | 121714AEUHAZ100391 |
| 128. | DOB | 060614 BENCH00960 |
| 129. | DOB | 051615CC0106MS |
| 130. | DOB | 050215 BENCH01210 |
| 131. | DOB | 080215 BENCH00814 |
| 132. | DOB | 092315AEUHAZ100421 |
| 133. | DOB | 110215BENCH00556 |
| 134. | DOB | 121416AEUHAZ100541 |
| 135. | ECB | 34042676R |
| 136. | ECB | 34042678K |
| 137. | ECB | 34038600Z |
| 138. | ECB | 34069597Z |
| 139. | ECB | 34090099M |
| 140. | ECB | 35058642L |
| 141. | ECB | 34507335X |
| 142. | ECB | 32079907L |
| 143. | ECB | 32077453R |
| 144. | ECB | 34928758N |
| 145. | DOB | 062893LL629108376 |
| 146. | DOB | 050498LL629128332 |
| 147. | DOB | 030790C015P |
| 148. | DOB | 070290C011K |
| 149. | DOB | 070290C012K |
| 150. | DOB | 031903LL629125329 |
| 151. | DOB | 121009CAHEC01 |

| 152. | ECB | 34805337P |
|------|-----|-----------|
| 153. | DOB | 12009CAHEC02 |
| 154. | ECB | 34805338R |
| 155. | DOB | 100913AEUHAZ100196 |
| 156. | DOB | 090915AEUHAZ100260 |
| 157. | ECB | 35115981Y |
| 158. | DOB | 092315AEUHAZ100424 |
| 159. | ECB | 35116047J |
| 160. | DOB | 092315AEUHAZ100425 |
| 161. | ECB | 35116048L |
| 162. | DOB | 121416AEUHAZ100551 |
| 163. | ECB | 32079655Y |
| 164. | ECB | 35051727Z |
| 166. | DOB | V062893LL629108398 |
| 167. | DOB | 72915AEUHAZ100373 |
| 168. | DOB | 21416AEUHAZ100558 |
| 169. | ECB | 32079901K |
| 170. | HPD Building Violations | 50 Violations (7 Class A; 36 Class B; 7 Class C ) |
| 171. | DOB | 01916AEUHAZ100536 |
| 172. | DOB | 01916AEUHAZ100537 |
| 173. | DOB | 01916AEUHAZ100538 |
| 174. | DOB | 01916AEUHAZ100539 |
| 175. | DOB | 01916AEUHAZ100540 |
| 176. | DOB | 21416AEUHAZ100557 |
| 177. | ECB | 32055627K |
| 178. | ECB | 32079900Z |
| 179. | ECB | 35125558X |
| 180. | ECB | 35181796H |
| 181. | ECB | 35181797J |

| 182. | ECB | 3511799N |
|------|-----|----------|
| 183. | ECB | 35181925P |
| 184. | ECB | 35202316J |
| 185. | ECB | 35202317L |
| 186. | ECB | 34653766N |
| 187. | HPD Building Violations | 124 Violations (13 Class A; 94 Class B; 17 Class C ) |
| 188. | **Additional Violations for 21-27 33ʳᵈ Street** | |
| | DOB | |
| | V062893LL629108370 | |
| | V031903LL629125332 | |
| | V010109LL629120856 | |
| | V121311LBLVIO21784 | |
| | V121416AEUHAZ100555 | |
| | ECB | 32079902M |
| | HPD Building Violations | 37 Violations (5 Class A; 27 Class B; 5 Class C ) |
| 189. | **Additional Violations for 21-37 33ʳᵈ Street** | |
| | DOB | |
| | V062893LL629108369 | |
| | V031903LL629125327 | |
| | V121416AEUHAZ100556 | |
| | ECB | **32073309Y** |
| | HPD Building Violations | 71 Violations (13 Class A; 47 Class B; 11 Class C ) |
| 190. | **Additional Violations for 21-47 33ʳᵈ Street** | |
| | DOB | |
| | V0628933LL629108399 | |
| | V031903LL629125324 | |
| | HPD Building Violations | 131 Violations (13 Class A; 91 Class B; 27 Class C ) |
| 191. | **Additional Violations for 21-57 33ʳᵈ Street** | |
| | DOB | |
| | V062893LL629108400 | |
| | V031903LL629125325 | |
| | HPD Building Violations | 41 Violations (6 Class A; 26 Class B; 9 Class C ) |
| 192. | **Additional Violations for 21-67 33ʳᵈ Street** | |
| | DOB | |
| | V062893LL629108368 | |
| | V031903LL629125326 | |
| | V121416AEUHAZ100552 | |
| | ECB | **35133019R** |

|  |  |  |  |  |
|---|---|---|---|---|
|  | HPD Building Violations |  | 93 Violations<br>(9 Class A;<br>54 Class B;<br>30 Class C ) |  |
| 193. | **Additional Violations for 21-77 33ʳᵈ Street** |  |  |  |
|  | HPD Building Violations | 104 Violations<br>(22 Class A;<br>68 Class B;<br>14 Class C ) |  |  |
| 194 | **Additional Violations for 21-06 35ᵗʰ Street** |  |  |  |
|  | HPD Building Violations | 121 Violations<br>(14 Class A;<br>87 Class B;<br>20 Class C ) |  |  |
| 195. | **Additional Violations for 21-16 35ᵗʰ Street** |  |  |  |
|  | HPD Building Violations | 202 Violations<br>(18 Class A;<br>174 Class B;<br>9 Class C;<br>1 I Class) |  |  |
| 196. | **Additional Violations for 21-28 35ᵗʰ Street** |  |  |  |
|  | HPD Building Violations | 107 Violations<br>(30 Class A;<br>70 Class B;<br>7 Class C) |  |  |
| 197. | **Additional Violations for 21-38 35ᵗʰ Street** |  |  |  |
|  | HPD Building Violations | 56 Violations<br>(14 Class A;<br>38 Class B;<br>3 Class C;<br>I Class I) |  |  |
| 198. | **Additional Violations for 21-48 35ᵗʰ Street** |  |  |  |
|  | DOB |  |  |  |
|  | V062893LL629108397 |  |  |  |

| | | | |
|---|---|---|---|
| | V050498LL629128349 | | |
| | V031903LL629125322 | | |
| | HPD Building Violations | 16 Violations (3 Class A; 11 Class B; 2 Class C) | |
| 199. | **Additional Violations for 21-58 35th Street** | | |
| | DOB | | |
| | V062893LL629108375 | | |
| | V050498LL629128331 | | |
| | V031903LL629125323 | | |
| | HPD Building Violations | 87 Violations (17 Class A; 60 Class B; 10 Class C) | |
| 200. | **Additional Violations for 21-68 35th Street** | | |
| | HPD Building Violations | 80 Violations (10 Class A; 60 Class B; 10 Class C) | |
| 201. | **Additional Violations for 21-68 35th Street** | | |
| | HPD Building Violations | 127 Violations (20 Class A; 76 Class B; 31 Class C) | |
| 202. | **Additional Violations for 21-78 35th Street** | | |
| | HPD Building Violations | 127 Violations (20 Class A; 76 Class B; 31 Class C) | |