# Exhibit H

## ASSIGNMENT AND SUBORDINATION OF MANAGEMENT AGREEMENT

This ASSIGNMENT AND SUBORDINATION OF MANAGEMENT AGREEMENT (this "*Assignment*"), is made as of April 24, 2017, by ACROPOLIS GARDENS REALTY CORP., a New York corporation, having an address at c/o Metropolitan Pacific Properties, Inc., 21-77 33rd Street, Astoria, NY 11105 ("*Borrower*") and METROPOLITAN PACIFIC PROPERTIES, INC., a Delaware corporation, having an address at 511 Avenue of the Americas, New York, NY 10011 ("*Manager*"), in favor of NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, New York, NY 10020 (together with its successors and assigns, collectively "*Lender*").

### R E C I T A L S:

WHEREAS, as of the date hereof, Borrower has received a loan from Lender in the principal sum of $45,000,000.00 (the "*Loan*") which is evidenced by, among other things, that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Loan Agreement*") and that certain Amended, Restated and Consolidated Promissory Note, dated as of the date hereof, given by Borrower to Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Note*") (capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement); and

WHEREAS, the Loan is secured by, among other things, an Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Security Instrument*"), which grants Lender a first priority lien on the property encumbered thereby and more commonly known as the Acropolis Garden Co-op, Queens, New York (the "*Property*"); and

WHEREAS, pursuant to that certain Management Agreement, dated December 1, 2009, between Borrower and Manager (the "*Management Agreement*") (a true, correct and accurate copy of which is attached hereto as **Exhibit "A"**), Borrower employed Manager exclusively to rent, lease, operate and manage the Property and Manager is entitled to certain management fees (the "*Management Fees*") thereunder; and

WHEREAS, as a condition to the making of the Loan, Lender requires that Borrower assign the Management Agreement to Lender and that Manager subordinate its interest under the Management Agreement in lien and payment to the Security Instrument and the other Loan Documents as set forth below.

NOW THEREFORE, in consideration of the above and the material promises contained in this Assignment, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Assignment of Management Agreement.** As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Management Agreement, said transfer and assignment to

automatically become a present, unconditional assignment, at Lender's option, upon the occurrence of an Event of Default.

2.     **Subordination of Management Agreement.** The Management Agreement and any and all liens, rights and interests (whether choate or inchoate and including, without limitation, all mechanic's and materialmen's liens under applicable law) owed, claimed or held by Manager in and to the Property, are, and shall be in all respects, subordinate and inferior to the liens and security interests created, or to be created, for the benefit of Lender, and securing the Obligations under the Loan Agreement and the other Loan Documents, and all renewals, extensions, increases, supplements, amendments, modifications or replacements thereof. This Section 2 shall be self-operative and no further instrument of subordination shall be required. If requested, however, Borrower and Manager shall execute and deliver such further instruments as the Lender may deem reasonably necessary to effectuate this subordination.

3.     **Termination.** At such time as the Debt is satisfied and the Security Instrument is released or reassigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Management Agreement shall terminate.

4.     **Estoppel.** Borrower and Manager each represent and warrant, for themselves, that (a) the Management Agreement contains all agreements between Borrower and Manager relating to the Property, (b) the Management Agreement is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment, (c) neither Borrower nor Manager is in default under any of the terms, covenants or provisions of the Management Agreement and neither Borrower nor Manager knows of any event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Management Agreement, (d) neither Borrower nor Manager has commenced any action or given or received any notice for the purpose of terminating the Management Agreement, (e) the Management Fees and all other sums due and payable to the Manager under the Management Agreement as of the date hereof have been paid in full, and (f) neither Borrower nor Manager shall enter into any modification of, or addition to, the Management Agreement without the prior written consent of Lender which may be given or denied by Lender in its reasonable discretion.

5.     **Agreement by Borrower and Manager.** Borrower and Manager hereby agree that upon the occurrence of an Event of Default during the term of this Assignment, or upon the occurrence of any event which would entitle Lender to terminate, or cause the termination of, the Management Agreement in accordance with the terms of the Loan Documents (a) Manager shall, at the request of Lender, continue to perform all of Manager's obligations under the terms of the Management Agreement with respect to the Property, or (b) at the option of Lender exercised by written notice to Borrower and Manager, Borrower and Manager shall immediately terminate the Management Agreement without the payment of any penalty or early termination fee.

6.     **Receipt of Management Fees.** Borrower and Manager hereby agree that Manager shall not be entitled to receive any Management Fee or other fee, commission or other amount payable to Manager under the Management Agreement for and during any period of time that any Event of Default has occurred and is continuing; *provided, however*, that notwithstanding anything to the contrary (a) Manager shall not be obligated to return or refund to Lender any Management Fee or other fee, commission or other amount already received by Manager prior to the occurrence

of the Event of Default, and to which Manager was entitled under this Assignment, and (b) in the event Lender has requested Manager to continue to perform all of Manager's obligations under the terms of the Management Agreement and Borrower loses possession of the Property in connection with the exercise by Lender of its rights or remedies under the Loan Documents, Manager shall be entitled to collect any Management Fee or other fee, commission or other amount accrued but unpaid prior to the occurrence of the Event of Default, and to which Manager was and otherwise is entitled under this Assignment. Manager acknowledges that it is looking solely to Borrower, and not to Lender, for payment under the Management Agreement (except as provided in clause (b) above), and the Manager waives any equitable lien which the Manager may now or hereafter have upon the proceeds of the Loan.

7.    **Lender Not Responsible for Liquidated Damages.**    Notwithstanding anything to the contrary contained in the Management Agreement, in the event that Lender elects to exercise its rights pursuant to Section 5(b) hereof and requests that Borrower terminate the Management Agreement on Lender's behalf, neither Borrower nor Lender shall be responsible for the payment of any liquidated damages in connection with such termination.

8.    **Consent and Agreement by Manager.**    Manager hereby acknowledges and consents to this Assignment and the terms and provisions of Section 10.1 of the Loan Agreement. Manager agrees that it will act in conformity with the provisions of this Assignment, the relevant provisions of the Loan Agreement and Lender's rights hereunder or otherwise related to the Management Agreement. In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof, Manager shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Management Agreement is terminated. Further, Manager hereby agrees (a) not to contest or impede the exercise by Lender of any lawfully exercised right it has under or in connection with this Assignment and (b) that it shall, in the manner provided for in this Assignment, give at least thirty (30) days prior written notice to Lender of its intention to terminate the Management Agreement or otherwise discontinue its management of the Property. Subject to the terms of Section 6 hereof, Manager shall be entitled to collect from Borrower any Management Fee or other fee, commission or other amount accrued but unpaid prior to the transfer of the responsibility for the management of the Property to which Manager was entitled under this Assignment. Notwithstanding the foregoing, so long (i) as no Event of Default has occurred and is continuing, and (ii) Borrower and Manager continue to comply with the applicable provisions of Section 5.11 of the Loan Agreement, Borrower and Manager shall have the right to renew the Management Agreement on the same terms and conditions that exist in the Management Agreement as of the date hereof, and such renewal shall not require Lender's prior written consent.

9.    **Further Assurances.**    Manager further agrees to (a) execute such affidavits and certificates as Lender shall reasonably require to further evidence the agreements herein contained, (b) on request from Lender, furnish Lender with copies of such information as Borrower is entitled to receive under the Management Agreement, and (c) cooperate with Lender's representative in any inspection of all or any portion of the Property. Manager hereby acknowledges that some, or all, permits, licenses and authorizations necessary for the use, operation and maintenance of the Property (collectively, the "*Permits*") may be held by, or on behalf of, the Manager. By executing this Assignment, Manager (i) agrees that it is holding or providing all such Permits for the benefit

3

of Borrower and (ii) agrees that as security for the repayment of the Debt by Borrower in accordance with the Loan Agreement, to the extent permitted by applicable law, Manager and Borrower hereby grant to Lender a security interest in and to the Permits. Moreover, Manager hereby agrees that, upon an Event of Default, it will assign the Permits to Lender if such Permits are assignable or otherwise continue to hold such Permits for the benefit of Lender until such time as Lender can obtain such Permits in its own name or the name of a nominee.

10.   **Assignment of Proceeds.**  Manager acknowledges that, as further security for the Note, (a) Borrower has executed and delivered to Lender that certain Assignment of Leases, dated as of the date hereof, assigning to Lender, among other things, all of Borrower's right, title and interest in and to all of the revenues of the Property.  In the event of a conflict between the terms hereof, on the one hand, and the terms of any Loan Document, on the other hand, the terms of the Loan Document, as applicable, shall govern and control.

11.   **Manager Not Entitled to Rents.**  Manager acknowledges and agrees that it is collecting and processing the Rents solely as the agent for Borrower and Manager has no right to, or title in, the Rents.  Notwithstanding anything to the contrary in the Management Agreement, the Manager acknowledges and agrees that the Rents are the sole property of Borrower, encumbered by the lien of the Security Instrument and the other Loan Documents in favor of Lender.  In any bankruptcy, insolvency or similar proceeding the Manager, on behalf of itself and on behalf of any trustee acting on behalf of the Manager, waives any claim to the Rents other than as such Rents may be used to pay the fees and compensation of Manager pursuant to the terms and conditions of the Management Agreement, subject to the terms hereof.

12.   **Governing Law.**  WITH RESPECT TO MATTERS RELATING TO THE CREATION, PERFECTION AND PROCEDURES RELATING TO THE ENFORCEMENT OF THIS ASSIGNMENT, THIS ASSIGNMENT SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, EXCEPT AS EXPRESSLY SET FORTH ABOVE IN THIS PARAGRAPH AND TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN ALL MATTERS RELATING TO THIS ASSIGNMENT AND THE OTHER LOAN DOCUMENTS AND ALL OF THE INDEBTEDNESS OR OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  ALL PROVISIONS OF THE LOAN AGREEMENT INCORPORATED HEREIN BY REFERENCE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, AS SET FORTH IN THE GOVERNING LAW PROVISION OF THE LOAN AGREEMENT.

13.   **Notices.**   All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "*Notice*") required, permitted or desired to be given hereunder shall be in writing and shall be sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or by reputable overnight courier, addressed to the party to be so notified at its address as set forth on the first page.  Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier. Notwithstanding the foregoing, any party may change the address to which any such Notice is to

4

be delivered, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this Section 12. Notices shall be deemed to have been given on the date they are actually received; provided, however, that the inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery, shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for either party may be given by its respective counsel. Additionally, Notice from Lender may also be given by Servicer.

14. **Waiver Of Trial By Jury.** BORROWER AND MANAGER AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THIS ASSIGNMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND MANAGER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND MANAGER.

15. **Modifications.** This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender, Borrower or Manager, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

16. **Number and Gender.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or Persons referred to may require.

17. **Inapplicable Provisions.** If any provision of this Assignment is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Assignment such provision shall be fully severable and this Assignment shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Assignment, and the remaining provisions of this Assignment shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Assignment, unless such continued effectiveness of this Assignment, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

18. **Headings, Etc.** The headings and captions of various sections of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

19. **Duplicate Originals, Counterparts.** This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed

AmericasActive:9023955.8

an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

     **20.**    **Successors and Assigns.**  This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Lender shall have the right to assign or transfer its rights under this Assignment in connection with any assignment of the Loan and the Loan Documents upon notice to Borrower. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment. Neither Borrower nor Manager shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender, and any attempted assignment without such consent shall be null and void.

     **21.**    **Secondary Market.**  Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Assignment and the other Loan Documents to one or more investors in the secondary mortgage market ("***Investors***"). In connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer, including, but not limited to, any subservicer or master servicer, on behalf of the Investors. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

     **22.**    **Lender's Reliance on Representations.**  Borrower and Manager have executed this Assignment in order to induce Lender to make the Loan to Borrower and to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

     **23.**    **Miscellaneous.**

         **a.**    Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory or not satisfactory to Lender and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

         **b.**    Wherever pursuant to this Assignment it is provided that Borrower shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender, whether incurred in connection with work performed by retained law firms, or the reimbursement for the expenses of in-house staff or otherwise.

     **24.**    **Manager Acknowledgment.**  Manager hereby agrees that, notwithstanding any provision to the contrary set forth herein or in the Management Agreement, Manager shall comply,

to the extent applicable, with the provisions of the Loan Agreement a final copy of which Manager acknowledges receiving.

      **25.**    **Inconsistencies.**   In the event of any inconsistency between the terms and conditions hereof and the terms and conditions of the Management Agreement, the terms and conditions set forth in this Assignment shall govern.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

7

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the date and year first written above.

**BORROWER:**

**ACROPOLIS GARDENS REALTY CORP.,**
a New York corporation

By: _____
Name: Debbie Vazquez
Title:   President

**MANAGER:**

**METROPOLITAN PACIFIC PROPERTIES, INC.,**
a Delaware corporation

By: _____
Name:  Steve Osman
Title:   President

*[Nati:is: Acropolis Gardens – Assignment and Subordination of Management – Signature Page]*

**EXHIBIT "A"**

MANAGEMENT AGREEMENT

[ATTACHED HERETO]

EXHIBIT A



# METROPOLITAN PACIFIC PROPERTIES, INC.

## MANAGEMENT AGREEMENT

THIS AGREEMENT, made this first day of December 1, 2009 between **Acropolis Gardens Realty Corp, a Cooperative Corporation** having an address at 21-05-77 33rd Street and 21-06-78 35th Street, Astoria, New York 11105 hereinafter referred to as the "Owner", and **METROPOLITAN PACIFIC PROPERTIES, INC.**, a Delaware corporation, having its principal office at 511 Avenue of the Americas, New York, New York 10011 hereinafter referred to as the "Agent".

### W I T N E S S E T H

That the parties hereto mutually agree with each other as follows:

**FIRST:** The owner hereby appoints the Agent, and the Agent hereby accept appointment, on the terms and conditions hereinafter provided, as exclusive managing agent of the Property.

**SECOND:** The Agent shall perform the following services to the reasonable satisfaction of the Owner.

(a) Cause to be hired, paid and supervised competent persons, if any, necessary to be employed in order to maintain and operate the Property as a first class property consistent with industry standards which, in each instance shall be the Owner's and not the Agent's employees, and cause to be discharged all persons unnecessary or undesirable, all subject to (i) applicable collective bargaining or other agreements, and (ii) the Owner's approval of employees to be hired or discharged. The Owner shall be consulted and shall have the right to approve all personnel to be hired and fired by the Agent pursuant to this paragraph (a). Agent shall replace its onsite Manager if said onsite Manager is not acceptable to Owner.

(b) Cause the common areas of the Property to be cleaned and maintained in such condition as may be deemed advisable by the Owner, and cause all ordinary repairs and incidental alterations to be made in the common areas of the Property in a prompt manner, and in such portions of the Property as are the responsibility of the Owner under the relevant proprietary or other lease agreement to which the Principal may be a party, including, but not limited to, repairs and incidental alterations involving plumbing, steam fitting, carpentry, elevator work, and decorating. Ordinary repairs or alterations involving an expenditure of over 5,000.00 for any one item shall be made only with prior approval of the Owner, but emergency repairs, immediately necessary for the preservation or safety of the Property or for the safety of tenant-shareholders, tenants or other persons, or required to avoid the suspension of any necessary service, may be made by the Agent irrespective of the cost thereof,

---

Page 1



without the prior approval of the Owner, but Agent shall, with reasonable promptness, notify the President, Vice President or Treasurer of the Owner thereof.

(c) Cause all such acts and things to be done in a prompt manner in or about the Property not involving an expenditure of more than $2,500.00, as shall be necessary to comply with any and all orders or violations affecting the Property placed thereon by any federal, state of municipal authority having jurisdiction thereover, or order of the New York Board of Fire Underwriters, the New York Fire Insurance Exchange or other similar bodies, expenditures of over $5,000.00, with respect to any one order or violation shall be made only with the prior approval of the Owner, but orders of violations requiring emergency action immediately necessary for the preservation or safety of the Property or for the safety of tenant-shareholders, tenants or other persons, or required to avoid the suspension of any necessary service or reasonably necessary to avoid criminal liability of the Owner or Agent, may be complied with irrespective of the cost thereof, without the prior approval of the Owner, but the Agent shall, with reasonable promptness, notify the President, Vice President or Treasurer of the Owner thereof.

(d) Furnish to the Owner advice of persons competent to opine on mechanical installations on the Property and the Operation of the elevators, pumps, boilers and other mechanical equipment of the Property.

(e) Enter into service contracts in the Owner's name and upon Owner's advance approval for steam, detective agency protection, vermin extermination, water treatment, boiler service, elevator maintenance, and other services or such of them as shall be approved by the Owner; purchase at competitive prices all supplies which shall be necessary to maintain and operate the Property properly; and credit to the Owner any discounts or commissions obtained for purchases or otherwise.

(f) Cause to be effected and maintained, to the extent obtainable, in such amounts and with such companies as the Owner shall designate, such insurance coverage as the Owner may deem necessary or advisable upon Owner's advance approval.

(g) All open or unpaid invoices, except utility bills, mortgages, gas electric, monthly retainer garage, elevators etc. must be submitted to Board President for approval by the 10th of each month after they are reviewed and initialed by the Property Manger. All approved invoices must be paid by the end of each month. Property Manager must resolve any contested invoices within 30 days.

(h) Bill tenant-shareholders and tenants of the Owner monthly for maintenance, rent and other charges and use its best efforts to collect such maintenance, rent and other charges and provide monthly statements to attorneys for Owner of all shareholders in arrears.

(I) Consider and, where reasonable, attend in a prompt manner to the complaints of tenant-shareholders and tenants. Advise Owner of any complaints not attended to, and the reason thereof.



Page 2



(j) Cause to be prepared and filed with respect to the Owner's employees in a timely manner the necessary forms for unemployment insurance, social security taxes and withholding taxes and all other employment forms required by any federal, state or municipal authority.

(k) Render monthly statement supported by bills to the Owner between the 15th and 25th calendar day of each month, and send a copy of each such monthly statement to the President and Treasurer and to all members of the Board.

(l) The Property Manager must review and initial all daily work orders submitted by the Corporative's personnel to ensure the completion of work order and submit to the Service Committee of the Board for review.

(m) Set up and maintain in a satisfactory manner separate and accurate books of account, payroll and other records of the Owner, and maintain orderly files of all correspondence, insurance policies and other documents (collectively called "Documents") pertaining to the Property (all of which shall be and remain the property of the Owner). In furtherance of the provisions of this paragraph, Owner shall furnish Agent with duplicates of books and records, including bank statements, as may be maintained by Owner. Agent shall, upon request of the Owner, make all Documents available to Owner, and its officers, accountants, attorneys and other representative and shall deliver same to Owner or its agents or representative on demand.

(n) Cooperate with the certified public accountant of the Owner, in an annual audit of the books of account of the Owner and the issuance by said accounts for an annual statement and semi-annual audit of the books' of the Owner, and send a copy of each such annual statement to each tenant-shareholder.

(o) Prepare and submit annually to the Owner an operating budget setting for the anticipated income and expenses of the Owner for the ensuring year; notify tenant-shareholders of annual and all other assessments of maintenance or other charges as determined by the Board of Directors of Owner.

(p) If requested, cause a representative to attend meetings of the tenant-shareholders and Board of Directors of Owner.

(q) Prepare and send out all notices of such meetings and such other letters and reports as the Board of Directors of Owner may request. Further, when requested, arrange for a suitable meeting place for and prepare agendas for such meetings.

(r) At Owner's request, send in a timely manner to a lender whose loan is secured by a tenant-shareholder's stock and proprietary lease copies of all notices of default given by the Owner to the tenant-shareholder.

(s) At Owner's request, receive and process in a timely manner applications for the sale and financing





of the Owner's stock and the accompanying proprietary leases, and the subletting of apartments by tenant-shareholders. (t) Should the Owner consider the tentative assessed valuation of the Property by the local tax jurisdiction excessive, cooperate with the Owner's attorneys in the preparation of an application for correction of the assessed valuation to be filed with the local tax authority.

(u) Cooperate with counsel for the Owner for all legal matters which should arise.

(v) Make court appearance, depositions and appearance before administrative agencies when required.

(w) Assist owner in preparation of long terms MCI project and budget after the first anniversary of this management contract.

(x) Agent will oversee any improvement project (see additional fee schedule attached).

(y) Review contracts at request of Owner.

**THIRD:** (a) Subject to the conditions and limitations set forth in Article SECOND, The Owner authorizes the Agent to perform any act or do anything necessary or desirable in order to carry out the Agent's duties contained in Article SECOND hereof, and everything reasonably done by the Agent under the provisions of Article SECOND shall be done as agent of the Owner, and all obligations of and at the expense of the Owner. The Agent shall not be liable or responsible with respect to any such commitment or purchase made in compliance with this agreement. Any payments made by the Agent hereunder shall be made out of such funds as the Agent may from time to time hold for the account of the Owner or as may be provided by the Owner. The Agent shall not be obligated to make any advance to or for the account of the Owner or to pay any amount except out of funds held or provided as aforesaid, nor shall the Agent to obliged to incur any liability of obligation unless the Owner shall furnish the Agent with the necessary funds for the discharge thereof. If the Agent shall advance voluntarily for the Owner's account any amount for the payment of any proper obligation or necessary expense authorized hereunder to be paid in connection with the maintenance or operation of the Property, Owner shall reimburse Agent therefor on demand. The Agent shall confer fully with the Owner in performance of its duties under this Agreement. In the event that the Owner shall be liable to the Agent for any matter of thing arising out of this Agreement or out of the Property, the members of the Board of Directors of the Owner shall have no personal liability.

**FOURTH:** (a) All funds billed by the Agent for the account of the Owner shall be deposited in a bank or trust company approved by the Owner in a segregated account in the name of the Owner and shall not be commingled with other funds held or collected by Agent; and that signatories on all bank accounts shall bear the names of those designated solely by the Board of Directors. Agent shall notify Owner of the Name of such bank or trust company, and the address of the branch thereof where the appropriate account is maintained.



(b) The Agent shall be under no liability or responsibility for any loss resulting from the insolvency of the depository in which funds are placed under this agreement.

**FIFTH:** The Agent shall not be liable to the Owner for any loss or damage not caused by the Agent's own negligence or failure to comply with its obligations hereunder. The Owner shall indemnify the Agent against and hold the Agent, its shareholders, officers and employees harmless, on demand, from (a) all claims, demands, liability, damages, costs and expenses (including, but not limited to reasonable attorney's fees and disbursements) sustained or incurred for injury to any person or property in, about or in connection with the Property, from any cause whatsoever, unless such injury shall be caused by the Agent's own negligence or failure to comply with its obligations hereunder, and (b) all claims, demands, liability, damages, penalties, costs and expenses, statutory or otherwise (including but not limited to attorney's fees and disbursements) for all acts performed by the Agent pursuant to this Agreement or the instructions of the Owner, provided, in each of the foregoing instances, that the Agent with reasonable promptness advises the owner of its receipt of information concerning any such injury and the amount, if know of any such claims, demands, liability, damages, penalties, costs or expenses. The Owner shall carry liability insurance (with limits acceptable to the Agent in its reasonable judgment), and shall include the Agent as a party insured under the liability policy and will deliver a copy of such liability policy to the Agent or a certificate evidencing same. Owner shall provide Workers Compensation and Employees Liability Insurance for Owner's employees. Agent shall provide Workers Compensation and Employees Liability Insurance for Agent's employees

**SIXTH:** The Agent shall be paid under this agreement as follows:

(a) For management services under Article SECOND (I) a management fee from the Owner in the amount of $ 210,000.00 per annum, payable in equal monthly installments of $ 17,500.00 on the first day of each month for the period from December 1, 2009 until November 30, 2019.

(b) For out-of-pocket disbursements to third parties (e.g., messenger charges, filing fees, etc.) made by Agent in the cause of performing its management services under this Agreement, the documented cost of such disbursements.

The Agent is hereby authorized to deduct and retain the amounts payable to Agent under subparagraph (a) and in regards to subparagraph (b) the agent shall send any bills to the Board on a monthly basis, for the Board to authorize payment of these bills, in order for management to deduct this amount from the account. Of this Article SIXTH from the maintenance, rent of other funds collected by it from the account of the Principal.

**SEVENTH:** (a) The terms of this agreement shall commence on December 1, 2009 and shall continue in force for ten (10) years. This agreement may not be terminated, by either party unless both parties agree. However, this agreement can be cancelled by the Owner with 60 days notice however, the entire balance of the contract must be paid in full to agent at time of termination. Contract may be assigned by agent should company be sold or merged. However, this agreement



will automatically renew for another ten (10) year period unless 60 days notice is given by either party

**EIGHTH:** All notices that the parties may desire or may be required to give hereunder to each other shall be deemed to have been properly given and shall be effective when and if sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the Agent at 511 Avenue of the Americas, New York, New York 10011, or to such other address or person as either of the parties may designate in writing. Notwithstanding the foregoing, any notice of change of address or of an additional person to receive further notices shall not be effective until received.

**NINTH:** This agreement, and every provision hereof, shall bind, apply to and run in favor of the Owner and the Agent and their respective successors in interest and may not be changed, waived or terminated orally. Neither of the parties may assign this agreement without the written consent of the other except that Agent may assign this Agreement to a wholly owned subsidiary or to a cooperation that acquired all the issued and outstanding shares of Agent.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

BY: _____
    Acropolis Gardens Realty Corp.
    Robert Bass, Board President

BY: _____
    METROPOLITAN PACIFIC PROPERTIES, INC.
    Steve H. Osman, Chief Executive Officer

Sworn to before me this __1__ day

of _____December_____, 2009

**BONNIE M. MUTIGNANI**
Notary Public, State of New York
No. 01MU6150509 - Queens County
Commission Expires July 31, 2010

Page 6



## SCHEDULE OF ADDITIONAL CHARGES

Stabilized Lease Renewal…………………………………… $500/per lease

Window Guard /Lead Paint Form(s)…………………… $ 15/per form

Interview Purchaser……………………………………… $375/per interview

Violation Removal………………………………………… $150 /per violation

Project Management Fee………………………………… 10% of total project

Marketing of Coop owned units for sale……………… 9% of sale price
(includes project management if renovation involved)


ACROPOLIS GARDENS REALTY CORP


DATED:      December 1, 2009



## AMENDMENT TO MANAGEMENT AGREEMENT

This Amendment to Management Agreement (the "Amendment") is entered into as of April ___, 2017, by and between Acropolis Gardens Realty Corp. ("Acropolis") and Metropolitan Pacific Properties, Inc ("Metropolitan") (collectively the "Parties").

## RECITALS

**WHEREAS,** Acropolis and Metropolitan are parties to that certain agreement dated as of December 1, 2009 (the "Management Agreement"), a copy of which is attached as Exhibit A hereto and made a part hereof by reference;

**WHEREAS,** the Parties hereby desire to amend the Agreement;

**WHEREAS,** Acropolis is seeking financing from Natixis Real Estate Capital LLC ("Natixis"), in the amount of $45,000,000.00, who has required certain amendments to the Management Agreement as set forth below as a condition to funding the loan; and

**WHEREAS,** in connection with said refinance, Metropolitan has entered into an Assignment and Subordination of Management Agreement with Natixis on even date herewith

**NOW THEREFORE,** in consideration of the above recitals and the mutual benefits contained herein, the Parties hereby agree as follows:

1. **PURPOSE OF AMENDMENT.**

This Amendment shall constitute the first amendment to the Agreement. The purpose of this Amendment is to release Natixis and Acropolis from liability for liquidated damages pursuant to paragraph SEVENTH of the Management Agreement in the event Natixis invokes its rights pursuant to paragraph 5.11.2 of that certain Loan Agreement dated _____ ("Loan Agreement") with Acropolis.

2. **AMENDED PROVISIONS.**

The Agreement is amended and supplemented as follows:

Paragraph SEVENTH shall conclude with the following:

In the event Acropolis Gardens' Realty Corp ("Acropolis") is requested to terminate the Management Agreement by its lender, Natixis Real Estate Capital LLC ("Natixis") in accordance with section 5.11.2 of that certain Loan Agreement dated _____ between Natixis and Acropolis, Natixis and Acropolis shall not be liable to Metropolitan for any liquidated damages, including but not limited to early termination fees, or other management fees that would otherwise be payable for the remainder of the term of the contract beyond the date of termination.

3.    **TERM OF THE AMENDMENT.**

This Amendment is made, entered into, and effective as of date first above written. This Amendment shall remain in full force and effect through the term of the Management Agreement, unless terminated at an earlier date pursuant to the provisions of the Management Agreement or pursuant to federal or state rule or regulation.

4.    **INCONSISTENCY.**

The Parties expressly agree that in the event of any conflict between this Amendment and the Management Agreement, the terms of this Amendment shall govern.

5.    **AGREEMENT CONTINUANCE.**

Except as expressly amended and supplemented by this Amendment, the Management Agreement shall continue to remain in full force and effect, and the Parties hereby ratify and confirm the terms and conditions thereof.

6.    **ENTIRE AGREEMENT.**

This Amendment, together with the Management Agreement, constitutes the final, complete, and exclusive statement of the agreement of the Parties with respect to the subject matter hereof, and supersedes any and all other prior and contemporaneous agreements and understandings, both written and oral, between the Parties.

7.    **MODIFICATION**

This Amendment may be supplemented, amended, or modified only by the mutual agreement of the Parties and Natixis, which agreement must be in writing and signed by both Parties.

8.    **SEVERABILITY.**

Whenever possible, each provision of this Amendment, including the amendment to specific provisions of the Management Agreement, will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Amendment is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Amendment will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provisions had never been contained herein.

9.    **COUNTERPARTS/ELECTRONIC SIGNATURES.**

This Amendment may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Amendment, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

10.   **AUTHORITY.**

Each Party executing this Amendment on behalf of himself, herself, or a limited liability company, corporation, or other legal entity, represents and warrants that he or she has all requisite right, power, and authority to do so and to bind such Party or entity to each and all of the terms hereof.

11.   **HEADINGS.**

Headings used in this Amendment are provided for convenience only and shall not be used to construe meaning or intent.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Amendment as of the date first above written.

_____
Metropolitan Pacific Properties Inc.
By: steve osman

_____
Date

_____
Acropolis Gardens Realty Corp.
By: Debbie Vazquez

_____
Date