UNITED STATES DISTRICT COURT                   1
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
WELLS FARGO BANK, NATIONAL      : 18-cv-05498-WFK-RLM
ASSOCIATION, AS TRUSTEE, ON     :
BEHALF OF THE REGISTERED        :
HOLDERS OF CSAIL 2017-CX9       :
COMMERCIAL MORTGAGE TRUST,      :
COMMERCIAL MORTGAGE             :
PASS-THROUGH CERTIFICATES,      :
SERIES 2017-CX9, et al.         :
            Plaintiffs,         :
                                : U.S. Courthouse
      - versus -                : Brooklyn, New York
                                :
ACROPOLIS GARDENS REALTY        :
        CORP., et al,           :
            Defendants          : July 11, 2019
                                : 10:39 AM
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR PROCEEDINGS
BEFORE THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For Plaintiff Wells Fargo:** **Amy Hatch, Esq.**
                              **Jason A. Nagi, Esq.**
                              Polsinelli PC
                              900 West 48th Place
                              Kansas City, MO 64112


**For the Receiver:**          **Jeffrey L. Nogee, Esq.**
                              Borah, Goldstein,
                              Altschulder, Nahins &
                              Goidel, P.C.
                              377 Broadway
                              New York, NY 10013


**For Defendant**
**Acropolis Gardens:**         **Kevin Barry, Esq.**
                              Law Offices of
                              Kevin J. Barry
                              480 Mamaroneck Ave.
                              Harrison, NY 10528

2

APPEARANCES (Continued):

For Defendant Acropolis
Associates:                          Stephen Meister, Esq.
                                     Ralph Stone, Esq.
                                     Meister Seelig & Fein LLP
                                     125 Park Avenue
                                     New York, NY 10017

                                     Benjamin J. Kaufman, Esq.
                                     Wolf Haldenstein Adler
                                     Freeman & Herz LLP
                                     270 Madison Ave
                                     New York, NY 10016

                                     Pui Chi Cheng, Esq.
                                     Law Offices of
                                     Cheng & Associates
                                     27-28 Thomson Avenue
                                     Suite 447
                                     Long Island City, NY 11101

Transcription Service:      Transcriptions Plus II, Inc.
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,

transcript produced by transcription service

1          THE CLERK:  Civil Cause for a Status

2    Conference, Wells Fargo, National Association, v.

3    Acropolis Gardens Realty Corp, docket number 18-cv-5498.

4          Will the parties please state their appearances

5    for the record.

6          MR. NAGI:  Jason Nagi from Polsinelli, P.C., on

7    behalf of the plaintiffs.

8          THE COURT:  Good morning.

9          MS. HATCH:  Good morning.

10          Amy Hatch here on behalf of the plaintiffs, as

11    well.

12          MR. NOGEE:  Good morning, your Honor.

13          Jeffrey Nogee on behalf of the receiver, and to

14    my right is the receiver, David Sorise.

15          THE COURT:  Welcome.

16          MR. MEISTER:  Good morning, your Honor.

17          Stephen Meister, Meister Seelig, for Acropolis

18    Associates, the defendant.

19          MS. CHANG:  Good morning, your Honor.

20          P.C. Chang for Acropolis Associates, as well.

21          MR. STONE:  Good morning.

22          Ralph Stone, with Meister, Seelig and Fein.

23          MR. BARRY:  Good morning, your Honor.

24          Kevin Barry for Acropolis Gardens Realty Corp.

25          MR. KAUFMAN:  Good morning, your Honor.

Proceedings                                                4

1        Benjamin Kaufman, Wolf Haldenstein for

2   Acropolis Associates, and to my right is Mr. Michael

3   Leifer, who is a principal of Acropolis Associates.

4        THE COURT:  All right.  Welcome to all of you.

5   Please be seated, and I encourage you to remain seated

6   during this proceeding, so you'll be closer to the

7   microphones.

8        Until last night, when I saw Mr. Meister's

9   letter of yesterday, I assumed that the purpose of this

10  hearing was simply to get the parties on track to and get

11  this matter resolved once and for all.

12       Then I read Mr. Meister's letter in which he

13  talked about a huge disparity between the parties'

14  calculations.  He did indicate that the parties agreed to

15  a 20 percent discount to be applied to the default

16  interest rate but he then concluded by saying we hoped to

17  resolve these issues at the conference.

18       It is not my purpose this morning to reopen the

19  negotiations, the protracted negotiations that have taken

20  place before the mediator.  The mediator, I know, has

21  worked long and hard with you.  He has a background on

22  what's transpired to date, I don't, nor is it appropriate

23  for me to get involved in that since the case is in

24  court-annexed mediation.

25       So I simply want to make sure that there is a

Proceedings                                    5

1   schedule in place and that all parties will comply with

2   that schedule.  So we're not here to renegotiate the

3   terms that the parties agreed to on the term sheet.

4           Is that clear?

5           IN UNISON:  Yes, your Honor.

6           THE COURT:  All right.  So where do things

7   stand now in terms of the plaintiffs' evaluation of all

8   the papers?  Can we set a date for closing?

9           MS. HATCH:  Well, your Honor, we have been

10  drafting numerous documents.  I believe earlier this

11  week, we have delivered some but not all -- thank you --

12  some but not all of the necessary documentation.

13          I can provide you kind of a list, if you want,

14  as to what we have provided and what's still needed.

15          THE COURT:  No, why don't you tell me when you

16  propose delivering the full package or completing the

17  package?

18          MS. HATCH:  I would hope to have that done

19  within the next week, but obviously it's still subject to

20  my client's review, and receiving --

21          THE COURT:  Why isn't your client reviewing the

22  documents before they're delivered to opposing counsel?

23          MS. HATCH:  We've been trying to expedite

24  matters to be able to get them to opposing counsel.

25  Obviously, when the deal -- when we have documents that

Proceedings                                    6

1  are final, my client needs to get final committee

2  approval for everything, and when the documents are

3  finalized, so we're trying to make sure we have documents

4  in a final form so that then we can receive final

5  approval for -- especially when it comes to the

6  subordinated loan, it's important that we understand all

7  of the terms.

8           We have -- they provided us subordinated loan

9  documents, a week or so ago, and we are in the process of

10 providing comments back to those any day now but we need

11 those documents to be finalized before we can get

12 approval for what that loan will be.

13          THE COURT:  Well in your letter of July 9, you

14 complain that you were supposed to get the documents from

15 the borrower two weeks before the closing date on June

16 28th, and that you didn't.  You got some documents a day

17 before, and other documents a few days before, and that's

18 a valid complaint.

19          So now you're talking about you need another

20 week, and it's already July 11th, and then after that,

21 your client needs to review the documents.  So yes, the

22 borrower was slow in getting documents to you but it

23 sounds like you and your client are not proceeding

24 expeditiously in order to get this case closed.  And it's

25 not sufficient for you to say you hope to have these

Proceedings                                                    7

1   documents by the end of next week.  That is how many

2   weeks past the June 28th date?  We're talking about three

3   weeks beyond the closing date.

4           MS. HATCH:  Understood, your Honor.

5           MR. NAGI:  Judge, I wasn't at the mediation but

6   when I spoke with Ms. Hatch, I had a conflict, and I

7   didn't want to slow it down.  We are trying to have this

8   thing move along fairly quickly.

9           My understanding was that the 28th date, Mr.

10  Herman, the mediator said we understand that it's

11  probably not going to happen then, and that's not

12  necessarily realistic, so what's --

13          THE COURT:  Yes, and particularly given the

14  delays in the submissions from the borrowers, it was not

15  realistic but if you were -- if the understanding was you

16  would get the documents two weeks before, then let's not

17  start talking about maybe getting this done by the end of

18  July.  That is not sufficient.

19          MS. HATCH:  Understood, your Honor, and we will

20  -- we are -- we want this deal to close.  I want to make

21  that very clear but there are a number of items that do

22  need to be addressed, and it's not just the

23  documentation.  There's other items that needed to happen

24  before closing that we're still working through.

25          So the documentation is one part of that, and I

Proceedings                                          8

1   can work on my end to ensure that drafts are circulated,

2   but obviously we -- I anticipate there being comments

3   back, and some negotiation needed.

4            I mean maybe that won't be the case but I will

5   work expeditiously on my end to make sure that drafts are

6   circulated.  I know we already did circulate drafts

7   earlier this week of several of the documents, and we

8   obviously need to receive comments back on those.

9            THE COURT:  And what about -- you say there are

10  things that -- other things that need to be done.  Are

11  you talking about the removal of liens and judgments?

12           MS. HATCH:  Yes.

13           THE COURT:  And does someone want to give me a

14  status update on that?

15           MS. HATCH:  I don't have an update on that,

16  other than that's one of the things, your Honor.  And

17  then the other second part of this is there has to be an

18  agreement as to respect to repairs that need to be done

19  at the property, and the timing with respect to those

20  repairs.

21           THE COURT:  Have these matters been discussed

22  with the mediator?

23           MS. HATCH:  I have talked with Mr. -- with Ira

24  about the need for the property to be lien free, I

25  believe, yes.  I know we talked also about, we received,

Proceedings                                    9

1  you know, a very extensive report with respect to the

2  parties jointly retained an engineer to inspect the

3  property and provide a report, and I understand --

4          THE COURT:  This is from the engineer that was

5  retained either by the parties jointly or by plaintiff?

6          MS. HATCH:  Retained jointly by the parties,

7  yes.

8          THE COURT:  And?

9          MS. HATCH:  And I believe the concern on the

10  other side was that the repairs were extensive, and that

11  the cost estimate was high, which we didn't necessarily

12  disagree with but we needed to have -- we did have a call

13  last week with their representative.  They have somebody

14  from their property management company, who identified

15  what repairs he thought should be done.

16          And so my client has heard from their person,

17  and has reviewed the report, and we are in the process --

18  my client has been in the process of trying to develop a

19  realistic or, you know, some type of compromise between

20  the two reports that we received with respect to what we

21  think is realistic for timing, and costs, to get what we

22  know are -- I mean, some are life safety issues that need

23  to be addressed.  I mean, one of the reasons the receiver

24  I think came today too is to just address any of those

25  concerns in the event there were questions with respect

Proceedings                                        10

1   to the repairs.

2              THE COURT:  All right.  I will hear from the

3   receiver.

4              MR. NOGEE:  Yeah.  So as noted in the report,

5   in my experience at the property with engineers I've had

6   out, there's a number of defects throughout the property,

7   deferred maintenance and capital items that I've been

8   addressing as necessary to cure any life safety issues.

9   These are primarily from roofs, facade, and window leaks,

10  part of the issue.

11             We also had an instance, almost two months ago,

12  regarding a ceiling collapse on a vacant unit that

13  triggered a gas leak, and shut down of one of the

14  buildings.  And we've been actively working with

15  plaintiffs' counsel and defendants in order to get to an

16  agreement on the plan and the cost to remediate that gas

17  shut down.

18             So at this point, I have received a proposal as

19  of last night from the defendants which I need to review

20  and then we can move forward to cure that condition which

21  is obviously very serious.  It's knocked out all the

22  stoves for an entire building.

23             MR. NAGI:  And your Honor if I may, I've seen

24  some of the complaints that Mr. Sorise is stealing from

25  the people that live there, and he's not in a very

Proceedings                            11

1    pleasant position.  He's doing his obvious best to try to
2    make everyone happy and get things done, so that it's not
3    going to disrupt the settlement or the property.
4              THE COURT:  Well is it plaintiff taking the
5    position that the closing cannot occur until every issue
6    has been remediated?
7              MS. HATCH:  No, your Honor.  I think our
8    position is is that the whole goal of this is to
9    reinstate this loan, and to allow this borrower to move
10   forward with a loan that is performing, and we certainly
11   don't want there to be a default 30, 60, 90 days
12   immediately into a reinstated loan.
13             So we want to address what concerns or issues
14   there are with the condition of the property to make sure
15   we address those now, and everybody is on the same page,
16   as to what needs to be done today or what needs to be
17   done in 90 days or maybe in a year, but we think it's
18   important that we all agree as to what's there right now,
19   and how it is going to be addressed over this time period
20   that we set forth in our agreement because otherwise,
21   we'll just be righting again in 90 days when we say
22   there's a nonmonetary default because there's leaking
23   roofs or something.  I mean, I just think it's important
24   that we all get on the same page.  There's just -- it's
25   too --

Proceedings                                    12

1          THE COURT:  Well, you say you want to get on

2     the same page but one minute ago, you said you're all on

3     the same page.  So I don't know what pages you're talking

4     about.  Has there been an agreement any kind of an

5     agreement with respect to the timing of the repairs?

6          MS. HATCH:  There is not, no.  That is what we

7     have the one report, and then we had a call at the end of

8     last week with their property management company who

9     indicated what he thinks the cost would be, and what he

10    sees as urgent matters.

11         We have internal people at the lenders who met

12    earlier this week, and trying to develop what we would

13    consider maybe an exhibit to an agreement that would list

14    out -- for instance, this loan agreement when it was

15    drafted two years ago had a very specific list of

16    immediate repairs that were to be done, and repairs

17    within a certain amount of time.  And there were escrows

18    set aside under the loan agreement.

19         The issue is that many of those weren't

20    completed because of the issues with the person that was

21    in control of the borrower up until late last year.  So I

22    think we're all on the same page that the person that was

23    managing the property didn't perform the way he was

24    supposed to perform but the way the loan agreement is

25    drafted, is that the property is going to be repaired and

Proceedings                                    13

1   maintained in a certain way.  And so we've been trying to

2   understand what was and was not completed in accordance

3   with the loan agreement, and what needs to be kept up in

4   the next -- through the course of this loan, the next

5   five, seven years until it matures, so that, you know, we

6   can basically modify what was previously agreed to.

7           THE COURT:  Does anyone else want to be heard

8   on these issues?

9           MR. NOGEE:  Your Honor, if I could be jump in

10  for one second?  From the receiver's stand point,

11  obviously this situation has created a log of confusion

12  in the receiver operating the property, and we have not

13  participated at all in the mediation on purpose, other

14  than the receiver providing information to the mediator,

15  as requested.

16          But the receiver had prepared to provide

17  information to the chosen new property manager but then

18  we were told that they didn't have a contract with the

19  borrower yet or with AGRC, and we have a concern about

20  providing any confidential information about shareholders

21  to the new property manager under the current

22  circumstances.

23          Similarly from a timing stand point, we have to

24  deal with both emergency repairs, and with arrears at the

25  property.  Those are impacted by directions or requests,

Proceedings                           14

1   primarily from the borrower, to stand down or hold still

2   for a moment, while they work things out.

3          The emergency repairs really need to go

4   forward.  As Mr. Nagi said, the shareholders,

5   particularly at the building where there's no gas, are

6   working off of hot plates, and are very unhappy with

7   their situation and blame the receiver for that.

8          Hopefully, at the end of this conference,

9   either among the parties or with the Court's help, we can

10  get some direction as to what the receiver can respond

11  to, and deal with immediately.  Do we send notices out on

12  arrears from the receiver saying here's a 30-day notice?

13  Do we wait for the new parties to take over, for a new

14  property manager to be put in place?  We have nonjudicial

15  foreclosure notices that are moving forward.  We don't

16  know if we're supposed to proceed with the auctions at

17  this stage, or again if it's going to close within two

18  weeks.  Do we hold off on the auction notices?

19         And again, most importantly, on the emergency

20  repairs, there's also a water leak which caused a lot of

21  damage that needs to be addressed.

22         THE COURT:  Well, you say that your client did

23  not participate in the mediation.  Has there been any sit

24  down with the lender and the borrower to hash out these

25  issues, rather than showing up in court, and asking the

Proceedings                                15

1   court to decide whether or not you should proceed with

2   foreclosures?

3        MR. NOGEE:  We've had emails back and forth.

4   Everybody, I believe, in this room has been in

5   communication on these issues, but again we're getting

6   mixed signals saying fo forward, don't go forward, and

7   that's our confusion.

8        THE COURT:  Well, I will tell you what, you're

9   all here now, and I think you should take this

10  opportunity to all sit around single table, and has these

11  things out.

12       MR. NOGEE:  Thank you, your Honor.

13       THE COURT:  And I'll be back in about a half-

14  an-hour or 45 minutes, and then you can report to me what

15  you've resolved, and tell me what date you've agreed upon

16  for the closing.

17       MR. MEISTER:  Can the borrower be heard or --

18  Acropolis Associates, your Honor?

19       THE COURT:  You can be heard but again, these

20  issues are going to have to be resolved among the

21  parties, because the Court is not going to start getting

22  involved in a mediation that has been underway for some

23  time before a court-annexed mediator.

24       MR. MEISTER:  Understood, your Honor, and I

25  won't get into the financial details or the details but I

Proceedings                                      16

1   do want the Court to understand a couple of things.

2          First of all, we only received documents

3   yesterday, and the day before yesterday, but what we --

4   besides --

5          THE COURT:  I understand that, and you were

6   late in providing documents to the plaintiffs.  So they

7   can't be faulted for not being ready to close on the 28th

8   but I think we should work to getting a new date, a

9   realistic date, and a real date, not some aspirational

10  date.

11         MR. MEISTER:  Okay.  And what I would like the

12  Court to understand, and what I want to make clear, is

13  that the reason we were a little bit late in the loan

14  document is the structure here very simply, conceptually,

15  without getting into financial details, is that two

16  individuals, one of whom is Mr. Leifer here today in

17  court for Acropolis Associates, and another owner of co-

18  op units at the building, are planning on making a loan

19  of many millions of dollars that would be used to bring

20  current, the loan, and to perhaps to make some of these

21  repairs.

22         We were waiting for, and still have not

23  received, an accounting of the interest, and an

24  accounting of the escrows.  We still don't have those

25  documents.  So we didn't know, and still don't know, how

Proceedings                                    17

1    much that loan will be for, and that was really the

2    reason for our delay.  In any event, we got kind of a

3    form document to them but we still don't know how much

4    money is involved, or frankly whether it's feasible, and

5    then we kind of tie into that discussion your Honor heard

6    about the engineering report.

7              There are, you know, over $10 million of

8    repairs listed in that report, and excuse me, we think

9    the estimates are severely in excess of market prices for

10   the repairs, and that was the subject of a conversation

11   between the parties, the mediators, not involved --

12   sorry, the receiver was not involved.  This was -- the

13   mediation was between the lender, and the borrower, and

14   Acropolis.

15             And then aside from that --

16             THE COURT:  Is there a dispute about the

17   repairs that need to be done or only the cost of doing

18   them?

19             MR. MEISTER:  I think there's a dispute about

20   three things; the scope of repairs, the timing of the

21   repairs, and the cost of the repairs.

22             THE COURT:  In other words, there's a dispute

23   about everything.

24             MR. MEISTER:  Yes, your Honor, unfortunately

25   there is.  And in addition, and I'm not going to get into

Proceedings                    18

1   any details because I heard what your Honor said, but we

2   see very material discrepancies between what was agreed

3   to in a term sheet, and the documents we've received so

4   far.  I'm not going to detail any of that because I don't

5   think your Honor wants to hear it.

6           But in my opinion, no matter what we agreed to

7   about the timing of documents, and we certainly would

8   like to see the rest of the documents, really all the

9   documents -- we've gotten none of the loan documents

10  whatsoever, and the accounting, but I think it's going to

11  be impossible to close the transaction without some

12  intervention; I guess another mediation session, which

13  the receiver should not be at.  It's got nothing to do

14  with the receiver, although he may supply information.

15          And so it's both we need the flow of

16  information of documents, and we're going to need to

17  resole a host of issues.

18          THE COURT:  And the documents that you believe

19  you need and haven't gotten are documents from the lender

20  or from the receiver?

21          MR. MEISTER:  From the lender.  The loan

22  reinstatement documents.  But, you know, I mean just to

23  give you one quick sense, there's -- so I said there's a

24  loan being made by Mr. Leifer, and another individual.

25  That loan is obviously going to be subordinate to the

Proceedings                                   19

1    reinstated mortgage loan.

2           But the agreement we've gotten is that

3    essentially could be no payments under that loan until

4    the first mortgage is paid off, and we're not going to be

5    able to arrange a loan under those terms and conditions.

6    We certainly know that it's subordinate, but what we

7    discussed at the mediation was that as long as there was

8    sort of a cash flow to pay the first mortgage current,

9    that loan could be serviced, that subordinate loan.

10          So I think it's suffice it to say that there

11   are a host of legal document and physical plan-type

12   issues that really have to be resolved, in addition to

13   finally getting the flow of documents, your Honor.

14          THE COURT:  Well, you should agree upon a date

15   by which you'll have those documents.  I take it it's not

16   an issue, the lender is not saying we're not going to

17   give you the documents.  It's a timing issue.  So what

18   you should talk about is agree upon a date for having

19   those documents, and if the term sheet -- if everyone

20   understands that the term sheet is nonbinding, and the

21   subordinate lenders are not prepared to go forward on the

22   agreed upon terms, then go back to the mediator but

23   recognize that this is going to be further delayed.

24          MR. MEISTER:  No, I --

25          THE COURT:  And I'm not going t sit here up

Proceedings                                        20

1    here and wave a magic wand, and make the issues go away.

2    Those are issues that ought to be addressed to the person

3    who has been intimately involved in all the negotiations.

4            MR. MEISTER:  Makes perfect sense.  I just want

5    to be clear, the supporting --

6            THE COURT:  But you should understand that the

7    plaintiff, the lender, may decide that it doesn't want to

8    wait any longer, and there is a foreclosure action that's

9    pending.

10           MR. MEISTER:  Understood, and we do understand

11   that, and the subordinate lenders are prepared to go

12   forward on the terms of the nonbinding term sheet, not on

13   the terms and the documents we've received so far.

14           I think we're all here, and I think you just

15   suggested this, your Honor, I think we should confer,

16   talk about some of these issues.  Frankly, I don't think

17   the receiver should be a part of that.  And then perhaps

18   we can re-confer with your Honor, I don't know, but I am

19   prepared --

20           THE COURT:  I don't know whether the -- I'm not

21   sure why you have an issue with the receiver being

22   present.  Does the receiver want to be present?

23           MR. SORISE:  Sure, I can participate as

24   necessary.

25           THE COURT:  Well, I will leave it up to the

1  parties to work that out but the receiver would have the

2  most knowledge about what is actually going on with some

3  of these units, and the problems with the repairs.  I

4  think it makes sense to have the receiver present.  I'm

5  not going to direct that but perhaps there should be some

6  discussion at the outset as to whether it's appropriate

7  to go forward with or without the receiver.

8              MR. MEISTER:  Okay, your Honor.

9              THE COURT:  I mean the receiver inherited a

10  mess in this property, and has been sending reports,

11  quarterly reports, to the Court.  What the receiver had

12  to deal with was enormous.

13             All right.  Anything else before I leave you?

14  All right.  I assume you'll need about half an hour?

15             MR. MEISTER:  We'll try to get through it in a

16  half an hour.

17             THE COURT:  All right.  Well, if you want more

18  than that, maybe we should just give you the phone number

19  in chambers, and call when you're ready.

20             MR. MEISTER:  Okay.

21             THE COURT:  But keep in mind that I have a 12

22  o'clock proceeding in another matter.

23             MR. NAGI:  Thank you, your Honor.

24             MR. NOGEE:  Thank you, your Honor.

25             MR. MEISTER:  Thank you, Judge.

```
                    Proceedings                    22
```

1          MS. HATCH:  Thank you.

2   (Off the record)

3          THE COURT:  All right.  We're back on the

4   record in the Wells Fargo case.  The parties have had

5   close to an hour, I guess, to talk among themselves.  And

6   how much -- so you're not asking for additional time to

7   talk today but are you -- is it your expectation that

8   you'll be going back to the mediator to ask for another

9   session in the near future?

10         MR. NAGI:  Jason Nagi, your Honor.

11         I don't believe that's the case, no.  I -- the

12  only thing that I -- I mentioned the mediator, so that

13  what I was suggesting to the Court was that if we did

14  have an issue, we think it would -- we could likely

15  handle it with the mediator, but I don't -- I'm not

16  saying that we need to have that at this point in time.

17         THE COURT:  And what about the flow of the

18  papers that at the outset of this proceeding were a

19  problem in finalizing the resolution?

20         MR. NAGI:  That's one of the things that we

21  intend to have an agreement on, so that we don't have any

22  further concerns.

23         THE COURT:  Well, when are you going to have an

24  agreement?  What do you foresee happening because I don't

25  want you to leave this courtroom, and everything is just

1    -- well, we'll talk some more at some point?  I really

2    want to get this matter back on track for resolution.

3              MR. NAGI:  What I was suggesting, your Honor,

4    is that we need to run it -- internally, we have a lot of

5    different parties that we're dealing with on the

6    plaintiff side, so what I don't want to do is me just say

7    oh, I think it could be done in whatever time frame that

8    is because I want to speak to the -- I think it's best

9    for us to speak to -- internally, and make sure that we

10   can get everyone's ducks in a row, and set a realistic

11   time frame.  So what we were suggesting is that we do

12   that.  We get it to the other side, and then we proceed

13   in the meantime.  So that there's not a necessary date

14   that I can give that would be --

15             THE COURT:  Well, I would like to give a date

16   for a status report, so that this doesn't just start

17   falling by the wayside.  If I give you a week, is that

18   sufficient time?

19             MR. MEISTER:  Yes, your Honor.  I think that --

20   Stephen Meister -- that would be a good time to get a

21   status report.  I am hoping we close it in a week or at

22   most two weeks.

23             MR. NAGI:  Same for the plaintiffs, your Honor.

24   We think a one week status report would be fine.

25             THE COURT:  All right.  That will be a joint

Proceedings                              24

1    written status report.  And is there someone here who can

2    bring the Court up to date on what's been happening in

3    the various state court actions?  And you can be seated.

4             MR. KAUFMAN:  Thank you, your Honor.  There are

5    a number of motions, and other things going on in the

6    state court.  We --- most of the state court proceedings

7    are now adjourned to a September 10th date.  So on

8    September 10th, there are a number of motions that are

9    scheduled now to be heard by Justice Livote but there's

10   nothing active other than some briefing on some motions

11   which will not be heard until the 10th.

12            MR. MEISTER:  But I don't think the Court

13   knows, or maybe the Court does know, that Justice Livote

14   denied the petition to overturn the shareholder vote.

15            MR. KAUFMAN:  Yes, I think we informed the

16   Court.

17            MR. MEISTER:  Oh, okay.  I wasn't sure.

18            MR. KAUFMAN:  Yes.

19            MR. MEISTER:  So that's been decided.  And was

20   an appeal taken of that?

21            MR. KAUFMAN:  There was a notice of an appeal

22   filed but no appeal has been perfected, and we don't

23   expect an appeal to be perfected because the lawyers who

24   represented that -- that shareholder, was the former

25   president of the board, have moved to be relieved as

Proceedings                                    25

1    counsel.  And that motion was granted.  So that was the

2    Jaspan Schlesinger firm.

3              MR. MEISTER:  Okay.

4              THE COURT:  And the September 10th date is a

5    return date?  There's going to be argument that date?

6              MR. KAUFMAN:  Yes, there are return dates on

7    several motions, and there's a status conference and, I

8    think, a preliminary conference scheduled for that date.

9              THE COURT:  All right.  Anything else?  All

10   right.  I really urge you all to work long and hard to

11   get this federal case resolved sooner rather than later.

12             MR. NAGI:  Understood, your Honor.

13             THE COURT:  Thank you very much.

14             IN UNISON:  Thank you, your Honor.

15             THE COURT:  Just one question, is there -- is

16   one of the motions pending in state court a contempt

17   motion against Osman and Met Pac?

18             MS. CHENG: It's actually here, your Honor.

19             THE COURT:  No, I know there's one here.  Is

20   there a parallel one pending in State Court or --

21             MR. KAUFMAN:  There was a contempt motion in

22   the books and records proceeding, and that was denied but

23   that was only in the books and records proceeding.  There

24   was a motion to reargue and renew, and that was denied.

25   We filed a --

Proceedings                                    26

1          THE COURT:  That was a contempt motion?

2          MR. KAUFMAN:  That was a contempt motion on the

3   books and records, not on the turning over the funds.

4   The issue of turning over the funds is a contempt motion

5   before this Court.

6          MR. MEISTER:  By the receiver.

7          MR. KAUFMAN:  Yes.

8          MR. MEISTER:  Right.

9          THE COURT:  All right.  Thank you.

10          MS. CHENG:  Thank you, your Honor.

11              (Matter concluded)

12                    -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

27

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **23rd** day of **July**, 2019.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.